UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ROBERT M. RANDOLPH and STEPHANIE W. RANDOLPH, AS TRUSTEE OF THE ROBERT M. RANDOLPH 2008 IRREVOCABLE LIFE INSURANCE TRUST DATED APRIL 1, 2008, *Individually and on Behalf of All Others Similarly Situated*, | ) ) ) ) ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| LINCOLN NATIONAL CORP. and LINCOLN NATIONAL LIFE INSURANCE CO. | ) ) ) ) | |
| *Defendants*. | ) ) | |

---

## ORIGINAL COMPLAINT – CLASS ACTION

---

TO THE HONORABLE JUDGE OF SAID UNITED STATES DISTRICT COURT:

Plaintiffs Robert M. Randolph ("Randolph") and Stephanie W. Randolph, as Trustee of the Robert M. Randolph 2008 Irrevocable Life Insurance Trust dated April 1, 2008 ("Trustee" and "Trust") bring this action individually and, as to some claims, on behalf all others similarly situated, and make this Complaint against Lincoln National Corporation ("Lincoln National") and its wholly owned subsidiary Lincoln National Life Insurance Company ("Lincoln") (collectively "Lincoln Defendants"). Plaintiffs alleges the following on either personal knowledge or information and belief, and after a full and complete investigation by the undersigned counsel.

1

# I.
## BRIEF OVERVIEW

This action arises from a national life insurance provider's breaches of its policies and attendant deception of its policyholders.

Plaintiffs bring this action individually and on behalf of similarly situated owners of JP Legend 300, and JP LifeWriter Legend 100, 200, and 400 series life insurance policies ("the policies") issued by Jefferson-Pilot Corporation ("Jefferson-Pilot") now held by Lincoln. Acting in conjunction with its parent Lincoln National, Lincoln has repeatedly breached the policies, and subjected Plaintiffs and other similarly situated policyholders to unlawful acts and practices: namely, the unauthorized implementation and collection of "Premium Load Charges" (f.k.a. "Expense Charges"), the repeated and deliberate practice of billing incorrect premiums, and the use of deceptive policy illustrations—practices all engineered with the ultimate aim of either (1) unlawfully inducing the opportunistic surrender or premature lapse of policies using a device called "shock premiums," or (2) extracting excessive payments from policyholders to which Lincoln was not entitled under the policies ("hostage premiums"). The Lincoln Defendants also subjected Plaintiffs to unlawful cost of insurance ("COI") increases.

Plaintiffs assert individual claims and class claims on behalf of putative nationwide class members for breach of contract based on the deliberately incorrect billing of premiums, the unlawful implementation and collection of "Premium Load Charges" (f.k.a. "Expense Charges"), and the use of deceptive policy illustrations. Plaintiffs individually assert an additional breach-of-contract claim based on the Lincoln Defendants' implementation and collection of unlawfully inflated COI charges. Plaintiffs also assert individual statutory claims arising under the Texas Insurance Code for the Lincoln Defendants' violations of the Texas Insurance Code based on the deliberately incorrect billing of premiums, the unlawful implementation and collection of

"Premium Load Charges" (f.k.a. "Expense Charges"), the unlawful implementation and collection of inflated COI charges, and the use of deceptive policy Illustrations and Statements of Account. Plaintiffs reserve the right to amend this Complaint, and fully expect to amend this Complaint, to assert similar Texas Insurance Code claims on behalf of putative Texas class members, and Plaintiffs intend to make such an amendment at the expiration of the Texas Insurance Code's mandatory notice period. The statutorily required notices are being served on the Lincoln Defendants contemporaneously with the filing of this Complaint, and are attached hereto as Exhibits L and M.

## II.
## THE PARTIES

**A.     Plaintiffs**

1.     Robert M. Randolph is a resident of Weatherford, Parker County, Texas, and the insured under a Legend 300 flexible premium adjustable life insurance policy, with policy number JP525505 (the "Policy"). The Policy was issued to be effective September 9, 2002, by Jefferson-Pilot Life Insurance Company, as insurer, with insured Randolph, for initially a $380,000 death benefit. Following his purchase of the Policy, Randolph transferred ownership of the Policy to the Trust to be held in trust for the benefit of Stephanie W. Randolph, Randolph's wife, and as alternative beneficiaries, Randolph's three children: Jeanette Randolph Rollins, Nowlin G. Randolph, and Anne C. Randolph. The Trust was formed in accordance with the provisions of the Texas Trust Code on April 1, 2008. By the time of the Trust's formation, Jefferson-Pilot had merged into Lincoln. After receiving Randolph's notice of transfer of ownership of the Policy to the Trust, on April 29, 2008, Lincoln accepted transfer of the Policy to the Trust. At all material times after April 1, 2008, Randolph was acting on behalf of the Trustee of the Robert M. Randolph 2008 Irrevocable Life Insurance Trust dated April 1, 2008 (the "Trust"), which holds the Policy in

trust. The Trust holds no assets other than the Policy, and the Trust relies on Randolph's annual gifts to the Trust—from which the Policy's premium payments are made. Furthermore, pursuant to the terms of a Marital Property Agreement made effective on December 8, 2005, Randolph is bound to retain Stephanie W. Randolph (in her personal capacity) as primary beneficiary under the Policy. The Marital Property Agreement binds Randolph to keep the Policy in force, failing which, Randolph's estate would pay her $380,000 if she survives him, satisfied either from the death benefit of the Policy or from other assets of Randolph's estate.

2.      Stephanie W. Randolph is a resident of Weatherford, Parker County, Texas, and Trustee of the Trust holding the Policy.

**B.      Lincoln Defendants**

3.      Lincoln National has its home office and principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania 19087. Lincoln National is and has been at all material times a corporation organized under Indiana law. Lincoln National acquired Jefferson-Pilot for approximately $7.5 billion in cash and stock in a merger consummated in 2006. The combined company is one of the largest publicly traded life insurance companies in the United States of America, and it is the fourth largest in the State of Texas. Lincoln National's most senior executives—its CEO and CFO—both came to Lincoln from Jefferson-Pilot. Lincoln National is the parent of its subsidiary, Lincoln, and both conduct regular business under the same marketing name: "Lincoln Financial Group." According to letters sent to the policyholders, including Randolph, all of Jefferson-Pilot's insurance policies ("universal life insurance products") that are the subject of this lawsuit were transferred automatically to Lincoln as a result of the merger of Lincoln National and Jefferson-Pilot in 2006.  Lincoln National may be served by and through its

4

Texas agent for service of process: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

4.        Lincoln is a life insurance company incorporated under the laws of Indiana, with its principal place of business located at 100 North Greene St., Greensboro, NC 27401 according to public records.  Lincoln purports to be the current insurer of the Policy.  It also sent the misleading 2016 and 2017 communications regarding the universal life policies that are the crux of Plaintiffs' and similarly situated policyholders' claims under Chapter 541 of the Texas Insurance Code.  Lincoln may be served by and through its Texas agent for service of process, as registered by Lincoln with Texas Department of Insurance records: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III.
### JURISDICTION AND VENUE

#### A.
#### SUBJECT MATTER JURISDICTION

**i.        Subject Matter Jurisdiction Over Plaintiffs' Individual Claims**

5.        This Court has original subject-matter jurisdiction over the named Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1), because there is complete diversity between Plaintiffs and both Lincoln Defendants, and Plaintiffs assert claims in excess of $75,000.

6.        Plaintiffs file their individual action on behalf of the Trust, which was formed under the Texas Trust Code. The Trust holds the Policy, which was delivered in the State of Texas and insures the life of a Texas resident. The citizenship of a trust, for diversity-jurisdiction purposes, is determined by the citizenship of its trustee. Here, Trustee is a citizen of Texas. Likewise, Randolph is a citizen of Texas. Therefore, the Trustee and Randolph are both diverse from Lincoln

National—which is a citizen of both Indiana (its place of incorporation) and Pennsylvania (its principal place of business)—*and* Lincoln—which is a citizen of Indiana (its place of incorporation) and North Carolina (its principal place of business).

### ii.        Subject Matter Jurisdiction Over Class Claims

7.        This Court has subject matter jurisdiction over all class claims asserted herein under the authority of the Class Action Fairness Act ("CAFA"), codified in 28 U.S.C. § 1332(d). Plaintiffs are diverse from both named Defendants because Plaintiffs are Texas residents and Lincoln and Lincoln National are citizens of Indiana and North Carolina, and Indiana and Pennsylvania, respectively. On information and belief, there are 100 or more individual universal life policyholders with claims that may, and should be, tried jointly as class members on the ground that Plaintiffs' claims involve common questions of law and fact. On further information and belief, the aggregate sum of Plaintiffs' and all putative class members' claims exceeds $5 million, exclusive of interest and costs. Plaintiffs included the following types of relief when calculating the aggregate amount in controversy:

     a.   Compensatory damages;

     b.   Statutory damages, namely, treble damages awarded pursuant to Tex. Ins. Code § 541.152;

     c.   Attorneys' fees, as authorized by statute; and

     d.   Quantifiable injunctive relief.

**B.**
**PERSONAL JURISDICTION**

i. <u>**General Jurisdiction**</u>

7.    This Court has "general" personal jurisdiction over both Lincoln and Lincoln National.

    a.    ***Lincoln's continuous and systematic contacts with the State of Texas support an exercise of general jurisdiction over Lincoln.***

8.    Lincoln's contacts with this forum are so numerous, continuous, pervasive and systematic that they warrant the exercise of general jurisdiction. Per Texas Department of Insurance records, Lincoln accounts for 4.03% of the life insurance market share—generating ***over $450 million*** in written premiums—making it the ***fourth largest*** issuer of life insurance in Texas as of 2015. Lincoln sells many of these policies through its Texas-based advisors and offices directly. The policies that they do not sell directly are sold through Texas brokers and general agents with whom the Lincoln Defendants regularly conduct business.

    b.    ***Lincoln National's own continuous and systematic contacts with the State of Texas support the exercises of general jurisdiction.***

9.    Lincoln National has multiple subsidiaries, but it admits to being in the primary business of life insurance. In its most recent Annual Filing with the SEC, Lincoln National self-identifies as a "Life Insurance" company. *See* Lincoln National Corp., Annual Statement (Form 10-K), Feb. 23, 2017, at 1 (listing "6311 – Life Insurance" as its Standard Industrial Classification Code). Moreover, both Lincoln and Lincoln National operate under the same marketing name, "Lincoln Financial Group." That marketing name appears on a variety of documents sent to Texas policyholders, including premium invoices, rate increase notices, statements of account, and policy illustrations. To this point, Lincoln Financial Group is not a standalone legal entity, but is instead a conflation of Lincoln National and its subsidiary companies, including Lincoln.

10.     Lincoln National, operating under "Lincoln Financial Group," maintains continuous and systematic contacts with the State of Texas, as evinced by the numerous advisors, registered representatives, and other agents residing in this State and conducting business under the Lincoln Financial Group name or otherwise on the Lincoln National's behalf. Such business includes the selling of life insurance, annuities, health and accident insurance, and financial services to Texas residents. For perspective, Lincoln National houses three separate offices in this District alone.

     c.     ***Additionally, Lincoln's continuous and systematic contacts with the State of Texas impute to Lincoln National, supporting the exercise of general jurisdiction over Lincoln National.***

11.     At all times pertinent, Lincoln was acting on Lincoln National's behalf and as Lincoln National's agent in the administration and servicing of the Policy and the policies of all others similarly situated. To be sure, it was Lincoln National, not Lincoln, who negotiated and executed the Lincoln-Jefferson merger. Pursuant to the terms of that merger, Jefferson-Pilot merged into Lincoln, Lincoln National's wholly owned subsidiary at Lincoln National's instruction. In exchange, it was Lincoln National that paid Jefferson-Pilot shareholders in cash and Lincoln National stock. Through the merger, Lincoln National effectively purchased the subject life insurance policies while at the same time delegating the responsibility of administering and servicing those policies to Lincoln, which is a "significant subsidiary" of Lincoln National. *See* Rule 1-02(w) of Regulation S-X, codified in 17 C.F.R. part 210.1-02 (definition of "significant subsidiary").

ii.    **Specific Jurisdiction**

12.     This Court also has specific personal jurisdiction over both Lincoln and Lincoln National because the Lincoln Defendants cooperatively and purposely directed their business activities toward the State of Texas, availed themselves of the privileges of conducting business activities in Texas, and the claims asserted herein arise from and relate to those contacts.

13.     The Lincoln Defendants established contacts in this forum by their assumed sale and servicing of certain insurance policies held by Plaintiffs and other Texas residents, which were delivered in the State of Texas, and the Lincoln Defendants' assumption of obligations under the subject policies. Specifically, Lincoln assumed responsibility as insurer under the Jefferson-Pilot policies by virtue of Lincoln National's acquisition of Jefferson-Pilot. Since that time, the Lincoln Defendants acted in unison when conducting business in this State, including the servicing and administration of those policies. At Lincoln National's direction, and in accordance with the terms of the Lincoln-Jefferson merger agreement, Jefferson-Pilot merged into Lincoln in 2006—with Lincoln thereby assuming Jefferson-Pilot's obligations under the Policy and other universal life policies—Lincoln undertook the task of administering and servicing those policies, a great many of which were held by, and insured the life of, Texas residents.

14.     Lincoln and Lincoln National regularly conduct their business activities under the same marketing name, "Lincoln Financial Group." Many of the premium notices, illustrations, and statements of account at the heart of this litigation were sent on Lincoln Financial Group letterhead.

15.     As addressed in later part of this Complaint, Plaintiffs' assert claims arising from the Lincoln Defendants' deceptive use of policy illustrations. Contained in each of those policy illustrations is an express representation that the form is "presented by Lincoln Financial Group."

16.     Plaintiffs' also assert claims arising from the Lincoln Defendants' unlawful increases in cost-of-insurance charges based on "changed assumptions" regarding the policies. The notice letters sent to policyholders apprising them of the changes to coverage were sent on Lincoln Financial Group letterhead. Contained in each of those policy illustrations is an express representation that the form is "presented by Lincoln Financial Group." Furthermore, the "revised assumptions" letters instruct policyholders to call 1-800-487-1485 if they have any questions concerning their change in coverage. That phone number is Lincoln Financial Group's central line. Life-insurance-related matters are but one of several inquiries that can be submitted through that central the line.

17.     Finally, each Statement of Account provided by Lincoln contains a "Lincoln Financial Group Privacy Protection Notice," which reads as follows:

> The Lincoln Financial Group companies are committed to protecting your privacy. To provide the products and services you expect from a financial services leader, we must collect information about you . . . while your relationship with us continues, we will update and send our Privacy Practices Notice as required by law. Even after that relationship ends, we will continue to protect your personal information.

> In small print located at the bottom of the page, Lincoln defines "Lincoln Financial Group" as "Lincoln National Corporation and its affiliates."

18.     Lincoln Defendants' share a singular interest in this matter and serve that interest cooperatively through the same business. In light of the foregoing facts, as further discussed in the sections that follow, Lincoln National's contacts with the forum are imputed to Lincoln, and Lincoln's contacts with the forum are imputed to Lincoln National.

19.     The nature and quality of the Lincoln Defendants' contacts to this forum, and those contacts' source and connection to Plaintiffs' and putative class members' claims, together readily satisfy the "substantial connection test." The Policy underlying Plaintiffs' breach of contract

10

claims was delivered and negotiated in the State of Texas. Similarly, the acts and omissions that constitute the said breaches of contract occurred in Texas. Plaintiffs also assert private claims under Chapter 541 of the Texas Insurance Code ("TIC"), which provides a private right of action for Texas insureds to seek relief from insurers who conduct "unfair methods of competition" or "unfair or deceptive acts or practices" in the business of insurance in Texas. Concerning Plaintiffs' TIC claims, the Lincoln Defendants engaged in unfair methods of competitions and/or unfair or deceptive acts or practices in the State of Texas while conducting business in this State (and while availing themselves of the benefits of selling and servicing life insurance in this State) that consequently subjected them to this forum's jurisdiction. Those acts or practices include the delivery of incorrect premium notices "[m]isrepresenting the terms of a policy," Tex. Ins. Code § 541.051(1)(1)(A); and misrepresentations regarding the policy terms made "to a policyholder . . . for the purpose of inducing or that tends to induce the policyholder to allow an existing policy to lapse or to forfeit or to surrender the policy," Tex. Ins. Code § 541.051(5). At this time, Plaintiffs assert TDI claims individually on behalf of the Trust exclusively. However, Plaintiffs intend to amend this Complaint to assert class TIC claims on behalf of Texas policyholders with the same form policies and who experienced the same unfair or deceptive acts or practices. Plaintiffs fully intend to make such amendment as soon as soon as the Texas Insurance Code's statutorily required 60-day notice period for class claims expires.

20.     Plaintiffs assert common-law claims arising from the same deliberately incorrect billing practices, albeit involving policies delivered in different states, as the Lincoln Defendants admitted. Though the nationwide class may include policyholders from other states, Plaintiffs respectfully show that Plaintiffs do not assert any state-specific statutory claims on behalf of the nationwide class at this time (but intend to assert class claims for a Texas class under the Texas

Insurance Code). Plaintiffs assert common-law claims for breach of contract. Those claims follow virtually the same elements in all fifty states.

## C.
## VENUE

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

22.     The acts and omissions that underlie Plaintiffs' breach-of-contract claim occurred in this District, including (i) the delivery of deliberately incorrect annual premium invoices, (ii) the collection of unlawfully increased Cost of Insurance charges, (iii) the collection of improper Premium Load Charges (f.k.a. Expense Charges), and (iv) the issuance and delivery of deceptive policy Illustrations and Statements of Account to Plaintiffs.

23.     Venue in this District is also proper because the Texas Insurance Code claims asserted by Plaintiffs arise from "unfair methods of competition" or "unfair or deceptive acts or practices" conducted by the Lincoln Defendants in this District. First, Lincoln made, issued, or circulated one or more illustrations that misrepresented the benefits or advantages of the Policy, and the majority of those illustrations were delivered to Plaintiffs, through Doug Frazier, whose office is housed in this District. *See* Tex. Ins. Code § 541.051(1)(B). Second, in this District, Lincoln delivered to Randolph (and later, Trustee) premium notices containing the wrong premium amount—an actionable "statement misrepresenting the terms of a policy" pursuant to Section 541.051(1)(A) of the Texas Insurance Code. Separately, but similarly, Lincoln's practice of billing deliberately incorrect premiums constitutes a "misrepresentation to a policyholder by any insurer for the purpose of inducing or that tends to induce the policyholder to allow an existing policy to lapse or to forfeit or to surrender the policy." *See* Tex. Ins. Code § 541.051(5). That cause of action also rests on the incorrectly billed premium invoices delivered substantially in this District.

24.     Venue is also proper in this District under 28 U.S.C. § 1391(d) because the Lincoln Defendants are subject to the personal jurisdiction of the State of Texas, and this District is the district within which the Lincoln Defendants have the most significant contacts at the time of filing this Complaint. The Lincoln Defendants employ or contract with many business agents and operatives in this district. Plaintiffs as well as hundred if not thousands of putative class members did business with Lincoln (or their predecessor-in-interest, Jefferson-Pilot Life Insurance Company) in this District. The Lincoln Defendants have engaged and continue to engage in business in this District.

**D.**
**DISCLOSURE OF RELATED LITIGATION**
**(Philadelphia Class Action Against Lincoln Defendants)**

25.     Currently pending in the U.S. District Court for the Eastern District of Pennsylvania is a separate class action involving the Lincoln Defendants and life insurance policyholders, many of whom also purchased universal life policies. *See Barti R. Rharwani, et al. v. Lincoln National Corp. and Lincoln National Life Ins. Co.*, Cause No. 16-cv-06605-GJP ("*In Re: Lincoln National COI Litigation*"). The two actions are distinguishable in important respects making this case proper to file as a separate, stand-alone suit.  No class certification motion has yet been filed in that case, nor has there been a class certification.

26.     The plaintiffs in the *In Re: Lincoln National COI Litigation* asserted claims for breach of contract, breach of implied covenant of good faith and fair dealing, and injunctive relief (collectively, the "core claims"), as well as a variety of state insurance-law and consumer-law claims (collectively, the state-specific claims). Among the state-specific claims previously asserted, the Texas Subclass of the *In Re: Lincoln National COI Litigation*, originally plead causes

of action for violations of Article 21.21 of the Texas Insurance Code (the predecessor to Chapter 541, which Plaintiffs also bring claims under).

27.   The Lincoln Defendants' moved to dismiss all eight claims wholesale. The Eastern District recently ruled on that motion, dismissing the Texas Insurance Code claims without prejudice, offering the Texas Subclass class representative the opportunity to replead the Texas-based claims with greater specificity. However, the Eastern District Court denied dismissal of the other core claims, with the exception of the claim for declaratory relief. *See Memo. And/Or Op. Signed by Hon. Gerald J. Rappert*, Cause No. 16-cv-06605-GJP (Entered: Sept. 12, 2017). In the Amended Consolidated Class Action Complaint that we filed on September 25, 2017, based on leave of court granted on September 11, 2017, the Seventh Claim for Relief still alleges violations of 28 Tex. Admin. Code sections 21.2206 to 21.2212 and Texas Insurance Code article 21.21 on behalf of one of the class plaintiffs and a sub-class of Texas policy holders.

28.   The *In Re: Lincoln National COI Litigation* focuses almost entirely on the Lincoln Defendants' unlawful cost of insurance increases. Plaintiffs here make *no class claims* based on the cost of insurance increases. Although Plaintiffs here also assert *individual* claims arising from Lincoln's unlawful cost of insurance increases, it is but only one of four distinguishable bases for the claims asserted herein. In this lawsuit, unlike the *In Re: Lincoln National COI Litigation*, Plaintiffs assert individual claims against the Lincoln Defendants arising from not only Lincoln's improper unlawful cost of insurance increases, but also individual and class claims for distinct forms of misconduct that are not pled in the *In Re: Lincoln National COI Litigation*. Specifically, on their own behalf and all others similarly situated, Plaintiffs assert both "core" and "state-specific" claims arising from or related to the Lincoln Defendants' "Deceptive Illustrations and Statements of Account Scheme," "Deliberately Incorrect Annual Premium Invoice Scheme," and

14

the "Premium Load Charge Scheme," all described in more detail hereinafter. For these reasons, Plaintiffs respectfully show that both its individual claims, pleaded class action claim, and to-be-asserted Texas Insurance Code class action claims for a Texas class merit this separate suit.

## IV.
## FACTUAL BACKGROUND

### A.
### The Policies at Issue

29.     The policies at issue are all universal life policies (collectively, "UL" policies) issued by Jefferson-Pilot and its affiliated entities ("JP policies"). The principal benefit of universal life policies is that, unlike other kinds of whole life insurance that require fixed periodic premium payments, the premiums required for universal life policies are flexible and need only be sufficient to cover the COI charges and certain other expenses specified in the policy. The COI charge is typically the highest expense charge that a policyholder pays, at least on a month-to-month basis. As a result, the provision in the policy explaining how and when COI Charges can be adjusted is one of the most important terms of the contract.  Likewise, this places a heightened responsibility on the insurer to properly bill each annual premium so that the insured maintains the term and amount of insurance intended.

30.     Instead, each year Jefferson-Pilot (later, Lincoln) invoiced first Randolph, and then the Trustee, an annual premium of $4,983.22 (which was the initial discounted year's premium), and each year the invoiced amount of premium was paid. Randolph simply paid the premium as billed, trusting that sophisticated companies like Jefferson-Pilot and Lincoln could manage to issue invoices for the correct premium amounts.  With each year of incorrectly billed premium amount, Jefferson-Pilot, and then Lincoln, shortened the term of the policy, shrinking the insurance to

violate **two** **cardinal goals** that had been the central basis for Randolph's purchase of the insurance: (1) coverage to at least age 100; and (2) a $380,000 death benefit.

31.     Randolph purchased the Policy in order to pay premiums at a uniform rate, so as to create positive account values in earlier years (of lower mortality) on which interest would accrue and maintain his policy coverage to at least age 100. Any premiums paid in excess of the COI Charges and other delineated expenses are applied to a policy's "accumulation account," sometimes known as "policy account" or "cash value." These excess premiums earn interest, often called the credited rate.

32.     In this case, however, Plaintiffs and similarly situated policyholders did not receive the full benefits of their UL policies. Rather than provide their policyholders with what they contracted for, especially long-term, Lincoln used its own breaches of the policies to hold the policyholders hostage—putting them into the dilemma of paying higher-than-contracted large premium increases ("hostage premiums") to keep the policies in force (according to Lincoln), or letting the policies lapse (usually much later in the mortality curve, after the policyholders have paid years and years of premiums), hugely profiting the Lincoln Defendants thereby.

33.     Trustee holds in trust one of these Jefferson-Pilot universal life insurance policies on the life of Randolph, an 81-year-old attorney (retired since 1998) and resident of Weatherford, Parker County, Texas.  In 2002, Randolph compared other companies' universal life insurance policies and received detailed illustrations and information from Jefferson-Pilot through Doug Frazier, whose office is in Tarrant County, Texas, before ultimately purchasing his JP Legend LifeWriter 300 policy, effective September 9, 2002.  After initially owning his Policy individually, Randolph assigned his policy in 2006 to Stephanie W. Randolph, as Trustee for his Texas-formed life insurance trust. This assignment was acknowledged and accepted by Lincoln.  Since that time,

Randolph has received information on behalf of, and acted as agent for, Trustee. Trustee is also representative of all similarly situated Lincoln policyholders, including all members of all subclasses defined herein. Plaintiffs have retained as legal counsel George Parker Young, Rich Hyde, and the firm of Circelli, Walter, and Young, P.L.L.C. Plaintiffs have standing to bring all claims for relief asserted in this Complaint, and have been victimized by every type of unlawful and inequitable practice challenged in this Complaint. Lincoln's unlawful practices fall into four categories.

### The Deliberately Incorrect Premium Invoice Scheme

34.     When Randolph agreed to purchase the Jefferson-Pilot policy at issue, he was very clear that he wanted to purchase death benefits of $380,000, with that amount remaining the death benefit for the life of the policy, through his death, and that he wanted to be insured to at least age 100. Accordingly, on July 16, 2002, he was provided an illustration by Jefferson-Pilot (attached hereto as Exhibit B) that showed exactly that scenario, with the policy continuing to and past age 100, a death benefit of $380,000, and the premium amount being "-0-" premium after he attained age 100 (for ten ensuing years). Though retaining the right to adjust the premium based on very limited factors set forth in the contract of insurance, at the inception of the Policy Jefferson-Pilot specified to Randolph that to meet his **two cardinal goals** (death benefit of at least $380,000 and coverage to at least age 100), after an initial, one-time discounted year's premium of $4,983.24, he would pay an annual premium in the amount of $8,155. Despite explicit instructions provided in and with the Policy Application and accompanying materials to charge the premium required to maintain the death benefit of $380,000 for a term exceeding Randolph attaining age 100, first Jefferson-Pilot and then Lincoln incorrectly billed the annual premium for over 15 years.

35.     Each year Jefferson-Pilot (and later, Lincoln) invoiced Randolph (and later, the Trustee) an annual premium of $4,983.22 (which was the initial discounted year's premium), and

each year the invoiced amount was paid as billed.  However, with each year of incorrectly billed premium amount, Jefferson-Pilot, and then Lincoln, shortened the term of the Policy, shrinking the insurance to violate the **two cardinal goals** that had been the central basis for Randolph's purchase of the insurance.

36.     Randolph, age 81, though currently in excellent health, now has a medical history that makes him uninsurable for purposes of life insurance.

37.     After Lincoln changed the format of its invoicing and Annual Statement in September of 2014, several questions were raised about what Lincoln (and its predecessor Jefferson-Pilot) had been invoicing as premium on the policy and the effect on the policy term and amount.  Randolph (acting on Trustee's behalf), both directly and through Frazier, raised Lincoln's premium invoicing errors beginning in September of 2014, and several more times since (including having Frazier speak with Lincoln's chief legal counsel and its director of compliance in 2015). Lincoln continued to incorrectly invoice Trustee.  Shockingly, Lincoln refused to take any responsibility, informing Randolph that even with the inflated catch-up premiums they were now quoting, Randolph could only maintain insurance to 97 (three years short of the age 100 trigger, carrying ten more years of insurance under the policy at no premiums).

38.     Even though the Incorrect Annual Premium Invoices were entirely Lincoln's (and its predecessor Jefferson-Pilot's) fault, Trustee never sought a windfall.  From the time the billing errors were discovered, Plaintiffs simply sought to reach consensus on the required amount of a one-time catch-up premium payment by the Trust to keep the policy in force, with the originally agreed-upon term (coverage to and past 100 years) for a death benefit of $380,000.  Lincoln, however, took steps to make it impossible to determine the proper amount of this catch-up

premium amount, instead providing misleading information and illustrations showing a catch-up premium that only kept the term of the policy in force into age 97.

39.     To avoid the policy lapsing, in an abundance of caution, Trustee eventually paid the $44,000 catch-up payment and increased annual premium in the amount of $14,583. However, even after that, Lincoln continued to incorrectly invoice Trustee (most recently in September of 2017).

40.     On information and belief, Lincoln has engaged in this incorrect premium invoicing practice with hundreds if not thousands of insureds with the known consequence of inducing "shock lapses"—the surrender or premature lapse of policies provoked by sudden and dramatic spikes in payment obligations once the incorrect premium invoicing is brought to Lincoln's attention.  Even those who were fortunate enough to be able to fund the increased premiums quoted to at least keep their policy in force were still unfortunate in that they still had to endure Lincoln's charging of "hostage" premiums—premiums which Lincoln inflated to rates that it knew its elderly, uninsurable, and deeply invested policyholders would be forced to capitulate to, or experience lapses of their policies.

**The Deceptive Illustration Scheme**

41.     As discussed, the term of the Policy shortened as a result of the Annual  Deliberately Incorrect Premium Invoice Scheme, so Randolph, in an abundance of caution, solicited Lincoln for payment options to keep the Policy in force to at least the age of 100 for the full death benefit of $380,000. In response, on October 12, 2016, Lincoln sent an illustration representing that payment of an almost $44,000 catch-up ("$43,968") and increased annual premiums of $14,583 would keep the Policy in force until age 97 (notably, 13 years short of the initially agreed-upon term). Notably, the performance reflected in the October 12, 2016 Illustration does not reflect the

consequence of charges other than the COI charges (e.g., Premium Load Charges, *discussed below*) on the Policy's performance.

42.     Under the duress of the Policy lapsing, and in reliance upon an illustration sent by Lincoln on October 12, 2016, Plaintiffs made the $44,000 catch-up payment and the annual premium payment for 2016 year at the increased rate of $14,583, enclosed with a letter expressly noting that the check was for payment of the catch-up and the first-year at the increased premium and that they were paying in order to "prolong the life of the policy."

43.     However, on September 18, 2017, Randolph received from Lincoln a Statement of Account showing coverage that materially deviated from the coverage it represented it would provide per the October 12, 2016 Illustration. The September 18, 2017 Statement of Account showed that even with the catch-up payment, and all future planned premiums paid at the increased amount of $14,583, the term of Randolph's coverage would extend only to April 2032, at which time Randolph would be 95 years old. That is, eleven months after sending an illustration indicating that coverage would extend into age 97, Lincoln shaved two critical years off of Randolph's coverage.

44.     The Deceptive Illustrations and Statements of Account Scheme is further addressed in this Complaint *infra*, Part IV.F.

**The Unlawful Increase in Cost of Insurance ("COI") Rates**

45.     The Policy gives Lincoln limited discretion to determine the COI rate based on its expectation of future mortality, interest, expenses and lapses. In September 2016, Lincoln announced a COI rate increase for policies that have been in force for up to eighteen years. This increase was in excess of **_91%_** for Plaintiffs, and on information and belief, even higher for other insureds. Lincoln based the COI increases on impermissible considerations. On information and

belief, the COI Rate Increase resulted in the unlawful implementation and collection of significantly higher premiums for hundreds if not thousands of policyholders, and for many hundreds if not thousands of others, resulted in Lincoln's other goal: the surrender or lapse of their policies.

46.     The unlawful COI Rate Increase is further addressed in this Complaint *infra*, Part IV.D.

### The Improper "Premium Load Charges" and "Expense Charges"

47.     From 2002 to 2014, the Summaries of Policy Activity delivered as part of Plaintiffs' Statements of Account listed an annual deduction for what the statements reference as "Expense Charges"—which was applied annually and listed as a deduction separate from the cost of insurance charges. Over that 12-year term, Lincoln unlawfully deducted $5,775.66 in annual "Expense Charges." Later, beginning in 2015, Plaintiffs' annual Statements of Account began showing an annual deduction for what the Statements of Account reference as the "Premium Load Charge." Since 2015, Lincoln has unlawfully deducted $6,598.81.

48.     Although "Premium Load Charges" (f.k.a. "Expense Charges" deductions) appear in the Policy's annual Statements of Account, that term appears nowhere in the Policy, Policy Application, or any of the Illustrations. Nor does anything in the Policy, Policy Application, or Illustrations purport to authorize Lincoln to deduct an amount for "Expense Charges" as a separate charge additional to COI charges.

49.     Plaintiffs, acting by and through Randolph, reached out to Lincoln directly to inquire about the deduction (what is was, what it was used for, and on what authority Lincoln deducted it). However, those efforts were to no avail. On information and belief, the annual "Premium Load Charge" (f.k.a. the "Expense Charges" deduction) is, plainly stated, Lincoln's

illegal practice of implementing and collecting an unauthorized windfall from policyholders. The practice is even more culpable when considered in conjunction with the increase in premiums due to the COI Rate Increase in 2016 and/or the need to "catch up" due to the deliberately incorrect premium. Because the "Premium Load Charge" (f.k.a. the "Expense Charges" deduction) is calculated at a fixed rate of the amount of premiums paid, an increase in the size of the premiums creates a corresponding increase in the size of the Premium Load Charge. In effect, Lincoln has created an exponential windfall from its own windfall.

50.     As a result of the unlawful implementation and collection of annual deductions for "Expense Charges" and "Premium Load Charges," Randolph's coverage under the Policy has been shortened, requiring Plaintiffs to pay a significant catch-up payment and improperly increased premiums to keep the Policy in force until Randolph reaches the age of 97, not the original minimum 100 years of age for the full $380,000 death benefit.

51.     On their own behalf and on behalf of all others similarly situated, Plaintiffs bring common-law claims for breach of contract and equitable claims for injunctive relief based on the unlawful implementation and collection of "Expense Charges" and "Premium Load Charges." Plaintiffs also bring individual, statutory claims for violations of the Texas Insurance Code based on the unlawful implementation and collection of "Expense Charges" and "Premium Load Charges."

52.     The unlawful Premium Load Charge is further addressed in this Complaint *infra,* Part IV.E.

**B.**
**More on the Policy Sold to Randolph**

53.    At his then-current age of 66, Randolph communicated to Jefferson-Pilot, through Doug Frazier that three things were of utmost importance to him regarding the insurance that became the Policy: (1) that the Policy insure him to at least age 100; (2) that the face amount of the policy remain $380,000 over the course of the years until it paid at his death; (3) that the premiums be at a uniform rate necessary to accomplish (1) and (2). In other words, Randolph was not using the Policy as a tax avoidance device or wealth building mechanism.  Rather, he intended to use it as a means of providing financial security for his wife.

54.    On July 16, 2002, Jefferson-Pilot sent Randolph a Policy Illustration included in a document setting out many of the company's terms of the Policy.  A true and correct copy of the July 16, 2002 Illustration and the full document in which it is included is attached hereto and incorporated herein as Exhibit A. The first page of the July 16, 2002 Illustration (titled "Policy Illustration Explanation") reads, in relevant part:

> This policy allows for flexible premium payments **to age 100.** There is **no maturity date**. This policy will **remain in force** as long as the cash surrender value is sufficient to cover monthly policy expenses.

> Ex. A at 2 (emphasis added).

55.    In short, the July 16, 2002 Illustration represented coverage into age 100 for a $380,000 death benefit assuming the payment of planned premiums to age 100. At age 100, Randolph would no longer be required to pay premiums and the Policy would remain in force into age 110 so long as the cash value of his Policy was at least $1.

56.    Line one of the July 16, 2002 Illustration lists a Year 1 discounted premium outlay (paid at Age 66 and extending past Randolph's 67th birthday) for the sum of $4,983. The next line of the Illustration lists a Year 2 premium outlay (paid at Age 68) for the sum of $8,155. Years 2

through 34 list the same premium outlay, $8,155, to be paid by Randolph at Ages 67 to 99 (2004 extending to 2036). When Randolph purchased the Policy, he did so with the clear understanding that the annual premium would increase roughly 60% in 2003 and remain stable at that amount into Age 100, subject to premium increases limited to very limited circumstances not applicable here.

57.     Randolph reviewed multiple life insurance products offered by a variety of life insurance companies before Randolph ultimately chose his particular Policy with Jefferson-Pilot. Randolph was very specific about what he needed, and he picked his Policy based on a very select set of criteria that Jefferson-Pilot represented itself as being willing and able to satisfy. Even then, Randolph made sure to meticulously navigate the terms of his Policy Application and the July 16, 2002 Policy Illustration. Based on his very select criteria, the Policy with Jefferson-Pilot was his optimal choice.

58.     The July 16, 2002 Illustration contains material recitations of company obligations and a demonstration for how the Policy is to perform. Moreover, Randolph was **required to sign** the July 16, 2002 Illustration before Jefferson-Pilot would activate his Policy.

59.     Two weeks later, Jefferson-Pilot, through Frazier, presented Randolph with a Policy Application, which Randolph completed and signed on July 31, 2002, and submitted to Jefferson-Pilot, through Frazier. A true and correct copy of the Policy Application is attached hereto as Exhibit B. The "Billing Instructions" found in the Policy Application list a "Planned Premium" in the amount of $8,155, with the Premium Bill to be sent annually to the insured's "Home Address." Ex. B at 2.

60.     Jefferson Pilot accepted Randolph's Policy Application and issued a Legend 300 flexible premium adjustable life insurance policy with policy number JP525505 (the "Policy"),

dated and effective September 9, 2002. A true and correct copy of the Policy is attached hereto as Exhibit C.

61.     The Jefferson-Pilot merger into Lincoln was completed in April 2006, and Lincoln assumed all responsibilities and contractual obligations under the Policy and the policies of all other similarly situated Jefferson-Pilot policyholders. On April 3, 2006, Lincoln mailed Randolph a letter notifying him of the merger, Lincoln's assumption of insurer status under the Policy, and assuring him that "[a]ll other terms and benefits of your policy, contract or certificate will remain unchanged."

62.     On or about April 1, 2008, Randolph, as settlor, established the Trust, whereby he transferred his interest under the Policy to be held in trust and administered by his wife, Stephanie W. Randolph, as Trustee. Stephanie W. Randolph was also made primary beneficiary of the Policy, and Randolph bound himself contractually to her to see that the Policy premiums were paid so that the full death benefit of $380,000 was paid to her at his death (or, failing such Policy, pay her such sum from his estate if she survives him).  Lincoln accepted the change in ownership on April 4, 2008.

## C.
### More on The Deliberately Incorrect Premium Invoice Scheme

63.     When the Policy was issued on September 9, 2002, the "annual" billed premium for the Policy was $4,983.24.  Jefferson-Pilot's representations about this premium and future-level premiums varied.  The July 16, 2002 and the July 31, 2002 Policy Applications stated this $4,983.24 amount was a one-time, first-year, discounted premium, and that the premium was scheduled to increase in 2003 to the full-year premium of $8,155. The Premium Invoices and Statement of Account delivered to Randolph in 2003 incorrectly stated that the continuing annual premium would be $4,983.24.

25

64.     Jefferson-Pilot (and later, Lincoln) consistently sent Randolph incorrect premium notices of $4,983.24 each year *for fifteen years*, despite contract documents showing that the premium would increase after the first year to $8,155. Randolph paid the amount billed by Jefferson-Pilot (and later, Lincoln) of $4,983.24 through 2015 (and paid increased premiums of $14,583 for 2016 and 2017).  Lincoln has since admitted this incorrect billing was deliberate on its part, though it had the information that the entire premise of the purchase of the Policy in the first place was based on premiums after the first year being $8,155.00 until 2035.  On information and belief, Lincoln engaged in this deliberate practice of incorrectly billing premiums to numerous other UL insureds, with two main categories of damages accruing: (1) "shock premium" notices sent in policyholders' later years that cause forfeiture or the premature lapse of policies; or (2) "hostage" premium notices that unduly enable Lincoln to extract far more in premium payments than if the premiums had been properly billed in the first place, with Lincoln simultaneously attempting to shorten the term of the policy.

65.     In a letter sent with the Policy's 2014 Statement of Account on September 9, 2014, Lincoln notified Trustee that "certain assumptions" had changed regarding the Policy, namely, assumptions made about how it would perform based on premiums paid, cost of insurance, and interest rates. A true and correct copy of the September 9, 2014 Notice Letter is attached hereto and incorporated herein as <u>Exhibit D</u>. The September 9, 2014 Notice Letter further indicated that based on Lincoln's unilaterally revised, "current" assumptions, the Policy would now expire in June 2024, i.e., when Randolph attained the age of 88, *not* at the age of 100. This was not the bargain Randolph made with Jefferson-Pilot. He was very clear that he needed, and specifically intended, the Policy to extend to *at least* age 100.

66.     On September 9, 2015, Plaintiffs received a second notice letter, which contained substantially the same language as the September 9, 2014 Notice Letter. *See infra* ¶ 57. The September 9, 2015 Notice Letter notified Plaintiffs that certain assumptions had *again* changed. This time, Lincoln shortened Randolph's coverage to June 2023, i.e., when Randolph attained the age of 87— a year short of the previous year's projected coverage and 13 years short of the coverage represented at the Policy's inception. A true and correct copy of the September 9, 2015 Notice Letter is attached hereto and incorporated herein as Exhibit E.

67.     Through Frazier, Plaintiffs immediately inquired into the matter, seeking an explanation from Lincoln for why the current policy performance was not in line with the original illustrations and why coverage was precipitously shortening. Lincoln responded in a letter dated November 26, 2014, a true and correct copy of which is attached hereto and incorporated herein as Exhibit F.  In the November 26, 2014 Letter, Lincoln **admits** that "[t]he original illustration that was signed by the owner of the policy specified the first year premium at $4,983.24; afterwards, effective for the second policy year the premium was to be increased to $8,155 and continuing for the maturity of the policy[,]" and that the inconsistency between the Policy's performance and the July 12, 2002 Illustration was "attributable to premiums not paid as originally specified." Ex. F ¶¶ 1, 3. Lincoln purports to excuse its failure to follow the Policy's terms in the November 26th letter, stating,

> Per our review of policy activity, there is no record of any requests from the client or agent to change the specified premium for the second policy year. In 2002, we did not have the ability to code for future premium changes; this ability was no available until 2010 The policy owner or agent would have needed to contact us to have the premium billing amount changed for the second annual premium.

68.     Lincoln's November 26, 2014 Response Letter fundamentally misstates the nature of the Policy. Although it correctly admits that the premium was supposed to increase to $8,155

beginning in 2003, it incorrectly states that the $8,155 amount would be "[c]ontinuing for the **maturity** of the policy." (Emphasis added). This directly contradicts what was represented in the Policy Illustration sent on July 6, 2002: "[T]here is *no maturity date*. This policy will *remain in force* as long as the cash surrender value is sufficient to cover monthly policy expenses." Ex. B at 2 (next to subtitle "LifeWriter Legend 300") (emphasis added). Likewise, the November 26th Letter directly contradicts the "continuation" terms found on Page 8 of the Policy:

> **Continuation of Insurance**. This Policy and all riders will continue in force according to the terms as long as the cash surrender value is sufficient to cover the monthly deduction. If premiums are discontinued on any date, the value on that date will be used to provide insurance under this provision.

69.     More concerned about the immediate consequences of the Policy lapsing than arguing the Lincoln's liability for the incorrect billing, Plaintiffs, acting through Frazier, solicited options from Lincoln for keeping the Policy in force for the full Death Benefit of $380,000 until Randolph reached at least age 100. Those options included Randolph making a "catch-up" payment of $44,000 and payment of annual premiums in the amount of $14,583.00 (a ***78.8%*** increase from the original premium amount of $8,155). But even with Randolph's payment of the catch-up payment and dramatically increased premiums—payments designed to bring the Policy in line with the original coverage contemplated at its inceptions—coverage would be shortened from an attained age of 100 to 97.

70.     In an abundance of caution, on December 14, 2016, Randolph, acting on behalf of both Plaintiffs, sent a letter to Lincoln, accompanied by a check made payable to Lincoln for $58,583.00—$44,000 for the "catch-up" payment and $14,583.00 for payment of the 2016 premium. A true and correct copy of Plaintiffs' December 14, 2016 Letter is attached hereto and incorporated herein as Exhibit G.  The December 14, 2016 Letter recited the ways in which Lincoln

had incorrectly billed premiums for over a decade. It also explained what Lincoln's November 26, 2014 response letter diagnosed as the extended billing error's cause. Randolph's letter emphasized that neither Randolph, as original owner of the policy and the insured, nor Trustee, who by then held the policy in trust as the assigned owner, agreed that Lincoln was entitled to charge the increased premiums (due to the incorrect billing error) or the COI increases (discussed *infra* Part IV.D), and that the Trust expressly "reserve[ed] all rights to seek return of all or portions of the same." The December 14, 2016 Letter further clarified that the payments were not to be "construed as acceptance, ratification, or waiver of Lincoln's breaches of contract or other violations of law" and that "[i]n no way does the payment constitute waiver of applicable limitations, estoppel, or other legal and equitable reasons that Lincoln National is not entitled to charge the increased premium and catch-up." Rather, Randolph made the payments "in order to avoid the threatened risks of cancellation, benefit reduction or shortening of the full term of the policy."

71.     Aside from Lincoln's repeated errors computing the premiums due (which created the need for a catch-up payment in the first place), Lincoln incorrectly computed the catch-up payment itself in three ways. <u>*First*</u>, Lincoln calculated the catch-up payment using an incorrect projected duration of the policy to terminate when Randolph reached the age of 97, rather than the age of 100. <u>*Second*</u>, a multi-thousand-dollar discrepancy exists between the catch-up payment as billed and the catch-up payment as it should have been billed. The correct annual premium is $8,155. And the premium that Lincoln incorrectly charged each year from 2003 through 2015 was $4,983.24. The difference between the two figures (i.e., what should have been billed) is $3,171.76, which when multiplied by 13 (i.e., the number of years Randolph had been incorrectly billed as of that time) results in $41,232.88. But that is not the catch-up amount Lincoln charged.

Instead, Lincoln charged $43,968, which Randolph rounded up to $44,000 and paid. Lincoln failed to explain the additional $2,767.12 tacked on at Plaintiffs' expense.

72.     Lincoln's legal department has been on notice of the premium billing error since as early as October 2014. The Lincoln Defendants were reminded of the issue in September of 2015, when Frazier discussed the matter directly with Lincoln's chief legal counsel and director of compliance. And as if those events were not enough to put the Lincoln Defendants on notice of the billing error, Randolph certainly did the job with his thorough demand letter sent on December 14, 2016. On more than three separate occasions, Plaintiffs thoroughly apprised Lincoln of its errors.

73.     However, despite the wide array of notices received, in September of 2017, Lincoln *again* sent a premium notice for the 2017 year at the initial, discounted year's premium amount of $4,983.24. This prompted Randolph to write a *new* letter on September 1, 2017, in which Randolph once again notified Lincoln of its failure to adjust the premiums to the increased amount of $14,583.00, which itself followed 14 years of failing to adjust the premium upward from $4,983.25 to $8,155. Randolph enclosed a copy of the letter he sent on December 14, 2016, and a check for the full, increased premium amount of $14,583.

### D.
### More on The Unilateral and Unlawful Cost of Insurance Increases

74.     The Policy's premiums increased in 2016 for a reason totally separate from the Annual Deliberately Incorrect Premium Invoice Scheme described in Part C. In addition to the premium increases necessary to extend the life of the Policy, the Policy's premiums increased in response to Lincoln's unilateral and unlawful increase in the cost of insurance ("COI") for **all** the subject universal life policies.

**i.     Lincoln Unilaterally Increased the Policy's COI Rates in 2016.**

75.     On or about September 6, 2016, Plaintiffs received a letter from Lincoln indicating

that the Policy's monthly COI Rates would increase by an unstated amount beginning October 9,

2016. A true and correct copy of the COI Rate Increase Notice Letter is attached hereto as <u>Exhibit</u>

<u>H</u>. To justify the increase, Lincoln generically blamed its continued burden of "nearly a decade of

persistently low interest rates, including recent historic lows, and volatile financial markets."

Likewise, Lincoln told its brokers that the COI increases are the result of the following:

- "Lower investment income as a result of continued low interest rates";

- "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations"; and

- "Updated expenses, including higher reinsurance rates."

76.     The September 6th Notice Letter did not indicate the size of the COI Rate increase,

but instead directed the policyholder to request an "inforce illustration." Frazier did just that at

Plaintiffs' request. In response, on October 12, 2016, Lincoln sent Frazier an Illustration

representing that in order to keep Randolph's Policy in force into age 97, Plaintiffs would need to

pay a $43,968 catch-up payment plus new annual premiums of $14,583.00. Of course, the October

12, 2016 Illustration does not indicate how much of the 78.8% premium increase accounts for

remedying the incorrect premium billing error compared with how much of the increase accounts

for the newly noticed COI increases. That information can only be determined by comparing

Statements of Account from before and after the October 9, 2016 COI Rate hike.

77.     The Summary of Policy Activity found in Plaintiffs' 2016 Statement of Account

lists the COI charge for September 2016 as $370.89. By comparison, the 2017 Statement of

Account's Summary of Policy Activity lists the COI Charge for November 2016 (the first full

month of the post-COI Rate Increase) in the amount of $708.85—an increase of $338.85 dollars or ***91.1%***.

78.     Tellingly, Lincoln's September 10th Notice Letter did not indicate that it planned to increase rates due to future adverse cost increases. Instead, its notice dwelled on *past* costs—e.g., "We continue to face nearly a decade of persistently low interest rates, including historic lows." The letter provided no other explanation for the COI Rate increase in the face of improving mortality rates and an improving interest rate environment.

79.     Because of the COI Rate increase, Plaintiffs are now required to absorb significantly higher deductions to maintain the same level of coverage anticipated when Randolph purchased the Policy.

ii.     **The COI Rates are Limited to Certain Enumerated Factors.**

80.     The COI charge is typically the highest charge that a policyholder pays, at least on a month-to-month basis. As a result, the provision in the policy explaining how and when COI Charges can be adjusted is one of the most important terms of the contract.  This places a heightened responsibility on the insurer to properly bill each annual premium so that the insured maintains the term and amount of insurance intended.

81.     The size of the COI Charge is highly significant to policyholders for at least two important reasons: (a) the COI Charge is typically the highest expense that a policyholder pays; and (b) the COI Charge is deducted from the policy account (i.e., the savings or investment component) of a policy, so the policyholder forfeits the amount of the COI Charge entirely.

82.     Values built up in policyholders' interest-bearing accounts generate interest at a minimum guaranteed rate (or, potentially a higher, non-guaranteed rate). Absent other contributions, the interest generated is reduced by the monthly amount of the COI Charge and

Administrative Charge (collectively, the "Monthly Deductions"). If the COI Charge and Administrative Charge exceed the interest generated for the month (plus any amounts paid into the policy account), the Policy Value (and interest generating "principal") is reduced by the Monthly Deductions.

83.    Small changes in the cost of insurance rate ("COI Rate") can cause a dramatic increase in the dollar amount of the Monthly Deductions, particularly at older attained ages. Consequently, the higher the COI Rate, the greater the amount of the premiums required to maintain a positive Policy Value balance and avoid a lapse of the policy.

84.    Jefferson-Pilot's insurance policies (now Lincoln's) limit the insurer's ability to increase COI rates. Randolph's Policy contains the following contractual limitation (emphases added):

> The monthly cost of insurance rates are determined by us. **Rates will be based on our expectation of future mortality, interest, expenses, and lapses**. Any change in the monthly cost of insurance rates used will be on a **uniform basis** for Insureds of the same rate class.

85.    This provision restricts the circumstances under which the Lincoln may raise the COI rate and does not permit Lincoln to increase COI rates, for example, to cover for improper dividends Lincoln paid to Lincoln National, or miscalculations concerning past mortality assumptions, or past interest rates, expenses or lapse rates. Likewise, Lincoln is not permitted, pursuant to the policy terms to increase COI Charges to earn future profits higher than the level projected at the time the Policies were priced. Under the Policy, COI rates may only be raised based on expected *future* experience relating to the enumerated factors resulting from a deviation between actual and assumed experience using actuarially sound practices.

86.    On information and belief, each Legend policy in these series states that COI "will be based on our expectation of future mortality, interest, expenses, and lapses," and that "any

change" in COI rates "will be on a uniform basis for Insureds of the same rating class." On further information and belief, each Legend policy in these series states that "upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

### iii.   The COI Rate Increases Are Unlawful.

#### a.   *The COI Rate Increases Were Not Based on the Factors Enumerated in the Policy.*

87.     The Policy states that cost of insurance "[r]ates will be based on our expectation of future mortality, interest, expenses, and lapses." Likewise, the Illustration sent to Randolph, through Frazier, on July 16, 2002, states that "[t]he rates charged [for cost of insurance] are based on the policy year, the attained age of the insured, the insured's underwriting class and the amount at risk."

88.     Lincoln has pointed to three factors that it purports justify the increase: lower investment income as a result of continued low interest rates, "updated" mortality assumptions, and "updated" reinsurance costs—but those estimates are not sufficient to justify any increase in excess of ***91%***.

89.     *First*, reinsurance costs cannot provide material support for the increase, and reinsurance costs are not an enumerated permissible factor for an increase. Reinsurance is a cost that the insurer voluntarily undertakes with an undisclosed third-party; it is ***not a direct cost*** of administering the policy. Moreover, Lincoln National's earnings releases prior to the COI Rate increase do not mention losses due to increased reinsurance costs at all—in fact, its Q4 2014 results show a $53 million profit on recapturing policies from out of reinsurance contracts. Whatever changes there have been in Lincoln's future reinsurance costs cannot provide material support for the COI Rate Increase.

90.     To the extent Lincoln claims that the third-party reinsurance companies demanded premium increases, or that Lincoln recaptured certain liabilities associated with the Policy to avoid increased reinsurance premiums, any such increases were a direct result of Lincoln's own past failures to adhere to the underwriting standards used to price the reinsurance treaties rather than any future change in expected experience.

91.     *Second*, Lincoln claims that changing mortality expectations has contributed to some COI increases. But the opposite is true: Lincoln has filed interrogatory responses with the National Association of Insurance Commissioners (NAIC) in each year from 2010 to 2014 stating that it expects mortality experience to improve. Additionally, Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future." And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016."

92.     Nationwide, mortality (normally the most important element in COI rates) has continuously *improved* since the Policy was issued. Beginning at least as early as 1980, the NAIC has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that were commonly used by insurers at the time the Policy was priced to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. The Society of Actuaries is currently investigating an update of the CSO tables

with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to continuous mortality improvements since 2001.

93.     Moreover, Jefferson-Pilot (and later, Lincoln) sent Randolph (and later, Trustee), both through Frazier, several illustrations showing Policy coverage using the pre-increase COI rates. The Policy states that the illustrations will depict future COI rates based on "current mortality and interest factors." The illustrated COI rates in those illustrations were significantly lower than what they are after the COI increase, but mortality experience has not changed for the worse in the years since those Illustrations were provided. Since the illustrations were required to reflect "current mortality" when issued, and they illustrated cheaper future COI rates using those mortality assumptions, Lincoln cannot use its now-"current" mortality experience to justify a massive increase in the COI rate. Alternatively, if the Illustrations did not reflect Lincoln's then-current mortality assumptions when provided, then all these illustrations breached the contractual provision that the illustrations must be based on "current mortality and interest factors."

94.     In sum, changing interest rates, mortality, and reinsurance costs could not possibly justify the large and unusually sloped increase imposed on the Policy. Specifically, no changes in these factors could warrant imposing an increase that would result in Trustee paying higher COI rates when Randolph is younger than when he is older. This contradicts reasonable actuarial practice; for example, the Society of Actuaries report of the Individual Life Insurance Valuation Mortality Task Force lists three basic goals for the mortality table, and the COI rates for the Randolph's Policy runs contrary to the third: "Mortality for any given attained age should increase with duration since issue." Some other factor must have been included in the increase to generate

that strange and illogical shape, and the contract language does not permit such other factors to be used as the basis for a COI increase.

      **b.**     ***Lincoln used the 2016 COI Rate Increase to Recoup Past Losses.***

95.     The Policy requires that COI "[r]ates will be based on our expectation of future mortality, interest, expenses, and lapses." This language explicitly forbids COI Increases that are based on a carrier's desire to increase profits beyond the level assumed at pricing or to make up for past losses. Actuarial principles similarly prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it originally expected using its original expectations. Further, in its filings with the NAIC, Lincoln explained that "[c]ost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions. The adjustments are made in such a way that past losses (i.e., experience less favorable to the company than expected) are not recouped."

96.     Contrary to these basic principles, Lincoln admitted that it was using the increase to recover *past* losses when, in the letter sent to Trustee in September of 2016, it pointed to "**nearly a decade of persistently low interest rates**, including **recent historic lows**, and volatile financial markets" to justify the increase. Lincoln doubled-down on this admission when it told brokers that the increases were allegedly due to "lower investment income as a result of **continued** low interest rates." (emphases added). Lincoln's President and CEO Dennis Glass admitted to a reporter in or around September 2016—at the same time the 2016 COI increase was made effective—that Lincoln sees inforce repricing (i.e., the COI increases) as an opportunity to blunt the impact of the prevailing low interest rate environment.

97.     Further, the facts stated above (including dramatic improvements in mortality) indicate that a COI rate increase of this magnitude could not be supported by changes in Lincoln's

future cost expectations, and confirm that Lincoln is increasing its profit targets on an old, closed block,[1] and is attempting to recoup past losses or profits lower than initially projected.

98.     In revealing that the increase is allegedly due in part to "lower investment income as a result of continued low interest rates," Lincoln has made plain that it is trying to avoid its contractual obligation to meet the interest crediting rates it promised under the Policy, and to recoup past losses or past profits lower than the level of profitability assumed at pricing—thereby increasing future profits to levels higher than those projected at pricing. The Policy guaranties that Lincoln will credit to Policy account a minimum interest rate, often called the credited rate, of no less than 4% interest. While the interest rate can be higher, it cannot be lower than that—and the interest rate Lincoln credits is now at the floor of 4%.

99.     In April of 2012, the Center for Insurance Policy & Research ("CIPR"), a branch of the National Association of Insurance Commissioners, published a report warning of the effects on insurers of a prolonged period of low level interest rates, stating in relevant part:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .

> Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.

*** 

---

[1] Closed blocks (or books) are policies that are no longer sold actively, but are accounted on the financial statements of a life carrier as premium-paying policies.

100.    Lincoln explained that the increase was based on prior low investment returns, which caused Lincoln to sustain past losses or past profit levels lower than the priced-for levels during those prior years. Lincoln now seeks to offset or subsidize its credited interest guarantees and recoup its past financial problems through the COI Rate Increase and correspondingly increased premiums. What Lincoln is actually doing is attempting to avoid its obligation to credit the guaranteed interest rates under the Policy, to recoup past losses or past reduced profits and to shed the Policy by making the premiums to maintain them cost-prohibitive for policyholders—thereby frustrating policyholders' abilities to receive their contractual benefits under the Policies.

101.    Moreover, when Jefferson-Pilot priced and sold the Policy, it established a premium schedule that was designed to generate high profits in early durations followed by potential losses in later durations. Now, Lincoln, the successor to Jefferson-Pilot, wants to reverse that decision, and seeks to impose unfair and excessive COI rate increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired affirmatively enacted.

102.    However, non-guaranteed elements such as the COI rate and deduction amounts are required to reflect expectations of future, not past experience. Accordingly, Lincoln is precluded from re-determining those elements to recoup past losses or past constrained profits. To do so would violate the actuarial standards of practice and code of professional ethics.

**d.    *Lincoln's Used the COI Increases to Reap an Undue Windfall.***

103.    The COI Rate increases are part of an amalgam of predatory tactics used to induce the forfeiture or premature lapse of the Policy. If successful in doing so, Lincoln avoids its obligations under the Policy while reaping an undue windfall from past premiums paid. The COI Rate increases join the Lincoln's Deliberately Incorrect Premium Invoice Scheme in this regard.

Both practices exemplify what have been termed "shock lapse" tactics: unfair and deceptive schemes designed to force policy lapses by virtue of burdensome premium increases.

104.    As the Lincoln Defendants know, the unlawful COI Rate increases could likely result in Plaintiffs' forfeiture of the Policy. Trustee may decide to access the Policy's cash value and surrender value before those values are depleted and ultimately exhausted by increased deductions.

105.    What is perhaps most sinister about shock-lapse tactics is that they are being used against an elderly (and virtually uninsurable) party. At the time Randolph applied for the Policy in mid-2002, he was 66 years old. When applying for the Policy, he submitted to medical examinations conducted by medical professionals selected by an insurance company, as well as blood tests conducted at Jefferson-Pilot's direction. Through this vetting process, Randolph received Jefferson-Pilot's stamp of insurability approval, and rightfully so. But by the time Randolph had reached the age of 80, fourteen-years-worth of premium payments later, his circumstances had changed. Randolph was much older, and therefore elevated to a much risker underwriting class with a much higher mortality rate. What's more, since initiating the Policy in 2002, Randolph had undergone a by-pass operation in 2006 and endured chronic lymphocetic leukemia (currently in remission). In short, Lincoln decisively took actions to jeopardize the continuation of the Policy after Randolph had become patently ***uninsurable***.

106.    Plaintiffs were fortunate enough to bear the burden of the increased premiums, and thereby avoid a "shock lapse" of the Policy. Nevertheless, they were held hostage and continue to be held hostage by Lincoln in order to keep the Policy alive. Therein lies the catch-22. When faced with crippling cost increases, Plaintiffs could either capitulate to the increase and take on the significant and unplanned-for burden, or avoid that burden and lose the financial security they had

paid years- if not decades-worth of premiums to secure. In either event, Lincoln reaps undue benefits from the higher premium payments and excessive deduction charges, enabling the Lincoln Defendants to recoup past financial reversals, or, through lapses, entirely avoid their contractual Policy obligations.

### E.
### More on the Undefined and Unauthorized "Premium Load Charge"

107.    Since 2002, Plaintiffs have paid $12,422.47 in "Premium Load Charges" (f.k.a. the "Expense Charges" deduction), which Lincoln treats as annual deductions from the Policy's cash value—thereby reducing the amount of insurance paid for or the term of that insurance. That is, like the COI charges, Plaintiffs receive no benefit from the sums deducted as "Premium Load Charges" and "Expense Charges."

108.    There is no mention of an annual "Premium Load Charge" or "Expense Charges" deduction in the Policy Application, the Policy, or any Illustrations. Nor is a definition found in any of the 2003–2016 Statements of Account, the Policy, the Policy Application, or any of the Illustrations incorporated into and made part of the Policy. It was only recently, after reaching out to Lincoln directly, that Randolph obtained a vague, purported "definition" for the "Premium Load Charge." In an e-mail sent on September 23, 2017, Wendy Chase, VP of Customer Service at Lincoln Financial Group, unhelpfully "explained" the Premium Load Charge and Lincoln's reasons for charging it as follows: "Premium load is a result of 'Net Premium Factor' on page 4 of the contract."

109.    Per "page 4" of the Policy, the "Net Premium Factor" is a factor "used in calculation of policy values," (though how remains completely vague and ambiguous, resulting in construction against Lincoln), and in no way is it defined as a deduction from premium payments made to reduce the amount of insurance funded by the premium or the term of that insurance.  Indeed, the

term "Premium Load Charge" is found nowhere in the Policy.   Lincoln failed to explain on what authority it deducts the Premium Load Charge (i.e., where the Policy permits it). Instead, Wendy Chase referred to different terms in the Policy as a workaround for justifying something that is not found in the Policy.

110.    The itemization of deductions in the Policy's Statements of Account show the Premium Load Charges (f.k.a. the "Expense Charges" deduction) as assessed ***in addition to*** the COI charges and the Administrative Charges. By logical extension, the Premium Load Charge is ***not*** a COI charge, nor an Administrative Charge, but instead another unauthorized charge that Lincoln has simply decided to make. This means that Lincoln was deducting from premium payments something it had no authority to deduct under the Policy.

111.    Of course, the more pressing issue for Plaintiff and similarly situated policyholders is the amount of money being lost to this phantom charge. And it is no trivial expense.

112.    In this way, Lincoln benefits on two levels. On the first level, it unduly benefits from the unlawful increase in the COI Rate, as previously discussed, which increases the amount it can seize from Plaintiff for itself. As a consequence of higher COI Rates, the size of Plaintiff's premiums increase, and Lincoln benefits ***a second time*** from the corresponding increase in the size of the Premium Load Charge, apparently calculated as a percentage from those improperly increased premium amounts.

**F.**
**More on the Deceptive Illustration Scheme In Violation of the Texas Insurance Code**

113.     As discussed, the term of the Policy shortened as a result of the Deliberately

Incorrect Premium Invoice Scheme (shortening coverage from age 110 to age 87), so Randolph,

in an abundance of caution, instructed Frazier to solicit from Lincoln payment options to keep the

Policy in force to at least age 100 for the originally agreed death benefit of $380,000. Lincoln

responded by providing Frazier with several alternative payment schedule options for Plaintiffs to

increase Randolph's coverage.

114.     On October 12, 2016, Lincoln, through Frazier, sent Randolph  an Illustration that

if Randolph made a lump-sum, catch-up payment of $43,968 and increased annual premiums of

$14,583, the Trustee could keep his Policy in force into age 97 (notably, 13 years short of the

original coverage term). A true and correct copy of the October 12, 2016 Illustration is attached

hereto and incorporated herein as Exhibit I. Notably, although unbeknownst to Plaintiffs' at the

time, the October 12, 2016 Illustration **did not** include or account for Premium Load Charge

deductions.

115.     Under the duress of the Policy lapsing, and in reliance upon the October 12, 2016

Illustration, Plaintiffs reluctantly paid the $44,000 catch-up payment and the annual premium

payment for 2016 at the increased rate of $14,583 on December 14, 2016. In a letter enclosed with

the $58,583.00 payment, Randolph, speaking on Trustee's behalf, expressly identified that the

check was for payment of the catch-up and the first-year at the increased premium and that it was

being paid in order to "prolong the life of the policy."

116.     On September 15, 2017, Randolph had a phone call with Wendy Chase, VP of

Customer Service for Lincoln, in which he signaled his intention to sue Lincoln for the deliberately

incorrect billing of premiums and the unlawful implementation and collection of inflated COI

charges. Specifically, he pointed to his loss in coverage caused by Lincoln's practices, and made a demand for refund of the excess amount charged on the catch-up payment ($2,767.12); restore the annual premium to the $8,155 amount; pay the excess over $8,155 that he paid in premiums in 2016 and 2017; and to provide coverage to at least age 100 for the full death benefit of $380,000.

117.    On September 18, 2017, the Monday following Randolph's phone call with Wendy Chase, Plaintiffs received a Statement of Account purporting to show the Policy's account status as of September 9, 2017. To Plaintiffs' dismay, the September 18th Account Statement contained a Summary of Policy Activity showing that even with the catch-up payment, and all future planned premiums paid at the increased amount of $14,583, the term of Randolph's coverage would extend only to **April 2032**, at which time Randolph would be **_95_** years old. That is, less than a year after sending the October 12, 2016 Illustration representing that coverage would extend into age 97, Lincoln shaved two critical years off of the term of the Policy. A true and correct copy of the September 18, 2017 Statement of Account is attached hereto and incorporated herein as Exhibit J.

118.    **Two days later**, on September 20, 2017, Plaintiffs received a **new** Statement of Account, which like the September 18th Statement of Account, purported to show the Policy account status as of September 9, 2017. Furthermore, like the September 18th Statement of Account, the September 20th Statement of Account showed the Policy's projected coverage assuming the same catch-up payment and all future annual premiums at $14,583. However, unlike the September 18th Account Statement, the September 20th Account Statement showed a termination date, of **July 2033** (at which time Randolph would be **_97 years and 15 days_** old). Lincoln did not provide any explanation for why, in two days' time, Lincoln decided to add over a year's worth of coverage to the Policy. A true and correct copy of the September 20, 2017 Statement of Account is attached hereto and incorporated herein as Exhibit K.

119.    The September 20th Statement erroneously raised the Policy value and thereby extends the term by double-crediting a September 2017 premium of $14,583. The September 20, 2017 Statement of Account added 15 months of coverage to the Policy in a misleading effort to make it appear to conform with the October 12, 2016 Illustration.

## V.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Contract
*(Plaintiffs Individually)*

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

121.    Plaintiff is the insured and original owner of the Policy.

122.    Trustee is the successor-in-interest to Randolph's interest as the buyer and the insured under the Policy.

123.    The Lincoln Defendants are the successors-in-interest to Jefferson-Pilot Life Insurance Company and are parties to the Policy on which Plaintiffs assert their breach-of-contract claim.

124.    The Policy is a valid and enforceable contract. Randolph was required to sign the July 16, 2002 Illustration as a material condition for the Policy to become effective. Moreover, the July 16, 2002 Illustration contains numerous commitments by the insurance company, as well as the computations of Lincoln's obligations under the Policy. Accordingly, the July 16, 2002 Illustration and its terms are incorporated into and made part of the Policy.

125.    At all relevant times, Plaintiffs have performed their obligations under the Policy, except to the extent that their obligations have been excused by Lincoln's conduct as set forth herein.

126.     As further described in Subsections (i) through (iv), below, the Lincoln Defendants materially breached the Policy by unilaterally and unlawfully increasing the COI Rates and deduction amounts; by repeatedly incorrectly billing premiums owed; by wrongfully deducting Premium Load Charges from the Policy; and by failing to provide coverage consistent with the illustrations presented to Plaintiffs, through Frazier, and integrated into the Policy.

127.     The Lincoln Defendants' conduct and material breaches of the Policy proximately caused damages to Plaintiffs in an amount to be determined at trial.

**i.      Lincoln Breached the Policy by Repeatedly and Deliberately Billing Incorrect Premium Amounts.**

128.     By engaging in the repeated practice of billing premiums in amounts that were different from those found in the Policy, the Policy Application, and incorporated illustrations, the Lincoln Defendants materially breached the Policy.

129.     The Policy was clear on its mandate. Lincoln was to bill and collect $4,983 in the first Policy Year, after which time, it was to bill and collect $8,155. In exchange, Lincoln would insure Randolph's life to at least age 100 for a specified Death Benefit of $380,000. Lincoln critically failed to honor the terms of the Policy by failing to bill the premium at the contracted rate and gutting the term of Randolph's coverage. Lincoln simply did not honor the bargain.

130.     Randolph (and later, Trustee) at no point claimed a right to the discounted premiums.  Plaintiffs reluctantly made a catch-up payment in the sum of $44,000 and increased periodic premiums (and expressly reserving the right seek reimbursement of these amounts). Even then, the Lincoln Defendants failed to calculate, implement, and collect the catch-up payment and increased premiums in a way that was consistent with the original terms of the Policy. They blatantly overcharged Plaintiffs for the catch-up payment and reduced Randolph's coverage into

age 97. In sum, the Lincoln Defendants' deliberately incorrect billing practices are in material breach of the Policy.

131.    The Lincoln Defendants' conduct and material breach of the Policy has proximately caused damages to Plaintiffs in an amount to be determined at trial.

### iii.    Lincoln breached the Policy by Unilaterally and Unlawfully Increasing COI Rates and Deductions.

132.    By implementing the unlawful 2016 COI Rate Increase, the Lincoln Defendants materially breached the Policy. They also breached the covenant of good faith and fair dealing implied in the Policy.

133.    At a minimum, the COI Rate Increase is of such a magnitude that, even if legitimate cost of insurance increases were a factor, the Lincoln Defendants necessarily considered impermissible factors other than those enumerated for calculating the cost of insurance ("future mortality, interest, expenses, and lapses") in setting the level of the premium and COI Rate Increase.

134.    The Lincoln Defendants material breach of the Policy has proximately caused damages to Plaintiffs in an amount to be determined at trial.

135.    The Lincoln Defendants have made clear in statements and by their actions that they intend to continue implementing and collecting the inflated COI charges, and likely impose further COI increases in future years resulting in the continuation and likely enhancement of further harm to Plaintiffs.

### iv.    Lincoln Breached the Policy by Wrongfully Assessing "Premium Load Charges."

136.    By implementing and collecting the unauthorized Premium Load Charges (f.k.a. "Expense Charges"), the Lincoln Defendants materially breached the terms of the Policy.

137.     The Policy fails to define what the Premium Load Charge is and what it used for. Page 4 of the Policy lists a "Net Premium Factor" as one of the vague "factors used in the calculation of policy values." According to Wendy Chase, Lincoln uses the Net Premium Factor to calculate the undefined Premium Load Charge. But bootstrapping an unauthorized term to a vague factor used to calculate policy values does not amount to authorization. In fact, allowing the Lincoln Defendants to use these policy factors to unilaterally manufacture new and significant policy expenses whenever and wherever they see fit renders the policy a contract of adhesion. To be sure, Plaintiff would not even know how the Lincoln Defendants calculated the charge had Randolph not reached out to Lincoln directly.

138.     On information and belief, in the absence of any justification to explain its use otherwise, Plaintiffs show that the Premium Load Charges (f.k.a. the "Expense Charges" deductions) are nothing more than a pretext for impermissible deductions in breach of the Policy terms.

139.     The Lincoln Defendants' wrongful deduction of Premium Load Charges proximately caused damages to Plaintiffs in an amount to be determined at the time of trial.

140.     The Lincoln Defendants have made clear in statements and by their actions that they intend to continue implementing and collecting Premium Load Charges in future years resulting in the continuation and likely enhancement of harm to Plaintiffs.

### SECOND CLAIM FOR RELIEF
### Violations of Chapter 541 of the Texas Insurance Code
*(Plaintiffs Individually)*

141.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This claim is brought by Trustee, individually, on behalf of the Trust and as a Trust beneficiary. This claim is also brought by Randolph, as the insured under the Policy.

Plaintiffs reserve their right to amend this Complaint to assert class claims on behalf of other Texas policyholders similarly situated.

142.    Lincoln is a legal entity engaged in the business of insurance as an insurer. Lincoln's parent company, Lincoln National, is also a legal entity engaged in the business of insurance as an insurer.

143.    Lincoln and Lincoln National violated one or more provisions of the Texas Insurance Code, Chapter 541, Subchapter B, by *knowingly* engaging in acts or practices that constitute "unfair methods of competition" or "unfair or deceptive acts or practices" in the business of insurance.

144.    Plaintiff Stephanie W. Randolph has standing to assert Chapter 541 claims arising from the Randolph's purchase of the Policy in her capacity as Trustee and, separately, in her capacity as a beneficiary of the Trust.  Randolph has standing as the insured party under the Policy.

**i.** **Lincoln's Underbilled Premium Notices and Deceptive Illustrations/Statements of Account Misrepresented Policy Terms to the Detriment of Plaintiffs (Tex. Ins. Code. § 541.051(1)(A)–(B).**

145.    Section 541.051 of the Texas Insurance Code, in relevant part, expressly prohibits insurers from making, issuing, or circulating—or causing to be made, issued, or circulated—any estimate, illustration, circular, or statement misrepresenting the terms of any policy or the benefits or advantages promised by any policy. *See* Tex. Ins. Code § 541.051(1)(A) (misrepresentation of policy terms) (2015); *id.* § 541.051(1)(B) (misrepresentation of policy benefits or advantages). The Lincoln Defendants violated Section 541.051 in two distinct ways.

146.    *First*, the Lincoln Defendants violated Section 541.051(1)(A) by deliberately and repeatedly incorrectly billing Randolph (and later, the Trust) the wrong amount of premiums owed, continuing to do so even after Plaintiffs had repeatedly notified the Lincoln Defendants of the

billing error. Such conduct constitutes the making and issuing of a "statement" misrepresenting the terms of a policy.

147.    The Lincoln Defendants' violation of Section 541.051(1)(A) proximately caused actual damages to Plaintiffs in an amount to be determined at the time of trial. Accordingly, Plaintiffs bring a private cause of action against the Lincoln Defendants under the authority of Section 541.161, seeking the recovery of all actual damages proximately caused by Lincoln's violation of 541.051(1)(A).

148.    Moreover, the Lincoln Defendants had actual awareness of the falsity, unfairness, or deceptiveness of the illustration(s). The Lincoln Defendants continued to incorrectly bill premiums—most recently in September of 2017—despite numerous written notices sent by Plaintiffs apprising the Lincoln Defendants of the error. Accordingly, Plaintiffs seek additional treble damages in the sum of up to two times their actual damages caused by the violations. *See* Tex. Ins. Code § 541.152.

149.    ***Second***, and separately, the Lincoln Defendants violated Section 541.051(1)(B) of the Texas Insurance Code by providing Randolph (and later, the Trust), both through Frazier, with Illustrations and Statements of Account that materially misrepresented the "benefits and advantages of the policy" in its October 12, 2016 Illustration and the Statements of Account received on September 18th and 20th of 2017.

150.    The Lincoln Defendants represented that their Illustrations were based on their current expected future expenses from those that underlie the illustrations.

a. *Lincoln's Used Illustrations Depicting Policy Performance that was More Favorable to Plaintiff than Was Possible—a Trade Practice that is Prohibited By the Texas Department of Insurance.*

151.    In relevant part, the Texas Department of Insurance Trade Practice Regulations require that insurers develop a "disciplined current scale" to act as a "limit on illustrations." 21 Tex. Admin. Code § 21.2204. This scale must be "reasonably based on ***actual recent historical experience***." *Id*. § 21.2204(5) (emphasis added). Insurers may not use an illustration that "depicted performance more favorable to the policy owner." *Id*. § 21.2206(2)(E) (Prohibited Conduct).

152.    If the Lincoln Defendants' justification for the COI increase is to be believed, the October 12, 2016 Illustration that projected a coverage into age 97, rather than 95, depicted performance more favorable to the policyholder than would have been possible using a scale that was reasonably based on their recent experience. The reason for this is simple: Lincoln's expectations could not have changed in one-years time on a large enough scale to justify the shortened coverage, and Lincoln has never said anything publicly to suggest otherwise (despite its many pronouncements on the grounds for the increase).

153.    Even more incriminating is the shift of coverage from 95 to 97 in **two days** time, all other assumptions remaining the same. Separately, all of the Illustrations "depicted performance more favorable to the policy owner" because none of those Illustrations (including the July 2002 Illustration and the October 2016 Illustrations) accounted for the prospective impact of Premium Load Charges (f.k.a. the "Expense Charges" deduction) on the Policy's performance.

b. *Lincoln Failed to Adequately Disclose All Limitations Affecting the Payment of Death Benefits, namely, the Factors that Increase Premium Rates.*

154.    The Texas Department of Insurance has promulgated "Rules Pertaining Specifically to Life Insurance and Annuity Advertising." Those rules are codified in Title 28,

Chapter 21, Section 21.114 of the Texas Administrative Code, which reads in relevant part (emphasis added):

> If an advertisement that is an "invitation to contract" refers to a dollar amount, a period of time for which a benefit is payable, a cost of the policy, a specific policy benefit or the loss for which such benefit is payable, it shall expressly or specifically disclose those exclusions and limitations affecting the payment of benefits under the policy. *Without this disclosure it is determined that the advertisement would have the capacity and tendency to mislead or deceive*.

155.     The Lincoln Defendants' failure to disclose all factors influencing the COI Rate when advertising the Policy **set up** what would ultimately amount to a failure to disclose all "limitations affecting the payment of benefits under the policy." 21 Tex. Admin. Code § 21.1114. That failure to disclose **ripened** into an actual injury when Trustee paid the "hostage" premium at the increased rate in 2016.

156.     Per the Texas Department of Insurance's trade practice rules governing an insurer's use of illustrations, there is a presumption that the Lincoln Defendants' failure to disclose had "the capacity and tendency to mislead or deceive." Although enforcement of trade rules is reserved to public action initiated by the Texas Department of Insurance Commissioner, the presumption created by this particular trade rule violation serves as persuasive support for the private cause of action brought by Plaintiffs under Chapter 541 for "unfair or deceptive acts or practices" in the business of insurance. Specifically, by failing to disclose all material factors affecting the COI Charge, which share an inverse relationship with policy benefits, and by failing to account for Premium Load Charges (f.k.a. "Expense Charges") in projecting future coverage, Lincoln materially misrepresented the "benefits and advantages of the policy"—thereby violating Section 541.051(1)(B) the Texas Insurance Code.

157.     The Lincoln Defendants violation of Section 541.051(1)(B) proximately caused actual damages to Plaintiffs in an amount to be determined at the time of trial. Accordingly,

Plaintiffs brings a private cause of action against Lincoln and Lincoln National under the authority of Section 541.151(1), seeking the recovery of all actual damages proximately caused by the Lincoln's violation of 541.051(1)(B).

158.    Moreover, the Lincoln Defendants' had actual awareness of the falsity, unfairness, or deceptiveness of the Illustrations. Accordingly, Plaintiffs seek additional treble damages in the sum of up to two times Plaintiffs' actual damages incurred as a result of the violations. *See* Tex. Ins. Code § 541.152.

**ii.     Lincoln Made Material Misrepresentations About the Amount of Premiums Owed with the Intent of Inducing the Lapse, Forfeiture, or Surrender of the Policies (Tex. Ins. Code § 541.152(5)).**

159.    Section 541.051(5) of the Texas Insurance Code prohibits an insurer from "mak[ing] a misrepresentation to a policyholder insured by any insurer for the purpose of inducing or tending to induce the policyholder to allow an existing policy to lapse or to forfeit or surrender the policy."

160.    In the instant case, the Lincoln Defendants' violated Section 541.051(5) by deliberately billing Randolph (and later, the Trust) the incorrect amount of premiums owed with the ultimate aim of inducing, and tended to induce, the surrender or premature lapse of the Policy. Lincoln also violated Section 541.051(5) by providing deceptive Illustrations that did not account for Premium Load Charges when projecting future Policy performance.

161.    Pursuant to Section 541.151(1) of the Texas Insurance Code, Plaintiffs assert a private cause of action against Lincoln and Lincoln National, seeking recovery of their actual damages incurred as a result of Lincoln's violation of Section 541.051(5).

162.    Moreover, the Lincoln Defendants had actual awareness of the falsity, unfairness, or deceptiveness of the misrepresentations that tended to induce the lapse, forfeiture, or surrender

of the Policy. Therefore, Plaintiffs seek additional treble damages in the sum of up to two times their amount of actual damages incurred as a result of the acts or practices in violation of Section 541.051(5). *See* Tex. Ins. Code § 541.152.

### iii.    Reservation of Class Claims Arising Under Chapter 541 of Tex. Ins. Code.

163.    At this time, Plaintiffs assert only individual claims against the Lincoln Defendants for violations of the Texas Insurance Code. However, on information and belief, there are hundreds if not thousands of other, similarly situated Texas universal life policyholders, whose policies were issued and/or delivered in the State of Texas.  Plaintiffs reserve the right to amend this Complaint to assert state-specific class claims on behalf of putative universal life policyholders, and Plaintiffs intend to do so at the expiration of the mandatory notice period's expiration.

**THIRD CLAIM FOR RELIEF**
**Temporary and Permanent Injunctive Relief**
*(Plaintiffs Individually)*

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    The Lincoln Defendants engaged in the following practices, among others:

a.   Imposing the COI Rate Increase even though the Lincoln Defendants' expected future mortality exposure has improved and is better than the mortality upon which the original COI rate schedule is based in order to increase premiums, recoup past losses, force policyholders to surrender their policies, abridge the duration of the policies' coverage, decrease the Death Benefit amount of the policies, and/or force policyholders' policies to prematurely lapse.

b.   Following the sale of the policies, sending Statements of Account, annual reports, policy servicing statements, illustrations, and other documents and correspondences to Plaintiffs, through Frazier, without disclosing that there would be sudden, dramatic, and cost-prohibitive increases in the COI charges in 2016.

c.   Failing to provide any meaningful advance warning that they intended to massively and suddenly increase the COI amount commencing in 2016.

    d.   Ultimately providing a false and misleading explanation to Plaintiffs of the grounds for the COI Rate Increase.

    e.   Using deceptive illustrations that induced or tended to induce Plaintiffs into paying the catch-up payment and higher "hostage premiums."

    f.   Engaging in the repeated and deliberate practice of underbilling Plaintiff and other members of the Premiums Subclass with the intention of increasing premiums, forcing policyholders to surrender their policies, abridging the duration of the policies' coverage, decreasing the Death Benefit amount of the policies, and/or force policyholders' policies to prematurely lapse.

    g.   Unlawfully implementing and collecting "Premium Load Charges" (f.k.a. "Expense Charges"), which are undefined and unauthorized by the policies.

166.    If the Lincoln Defendants continue to unlawfully implement and collect inflated COI charges (which the Lincoln Defendants presumably intend to continually increase) and Premium Load Charges (which increase in tandem with increases in COI charges), Plaintiffs will suffer irreparable harm, including, but not limited to, continuing underinsurance and/or lapse of the Policy due to an inability to pay exorbitant premiums. Plaintiffs have no adequate remedy at law because a damages remedy for past violations will not preclude the Lincoln Defendants from continuing to implement and collect Premium Load Charges or unlawfully increased premiums. The Lincoln Defendants clearly intend to continue levying Premium Load Charges and to continue increasing COI rates. Accordingly, the Lincoln Defendants must be enjoined from the future implementation and collection of Premium Load Charges and COI charges (to the extent such COI charges exceed the reasonable bounds permitted by the Policy).

167.    If the Lincoln Defendants are not enjoined from their practice of using deceptive policy illustrations and statements of account—documents which deceptively omit the adverse effects of future Premium Load Charges and other charges to the Policy's cash and surrender values—Plaintiffs will suffer irreparable harm, including, but not limited to, the burden of further

"hostage" premiums or a "shock lapse" of the Policy.  Plaintiffs have no adequate remedy at law as the payment of past damages has no assurance of preventing the same misconduct in the future.

168.    If the Lincoln Defendants continue their practice of deliberately billing Plaintiffs incorrect premium amounts, Plaintiffs will suffer irreparable harm, including, but not limited to, the burden of further "hostage" premiums or a "shock lapse" of the Policy. Plaintiffs have no adequate remedy at law as the payment of past damages provides no assurance of preventing the same misconduct in the future.

169.    In consideration of the foregoing allegations, Plaintiffs respectfully request that the Court issue injunctions against the Lincoln Defendants preliminarily and permanently enjoining them from continuing to engage in unlawful and unfair conduct set forth above.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract (Class Claims)
*(On behalf of the Incorrect Premium Billings Subclass, Premium Load Charge Subclass, and Deceptive Illustrations Subclass)*

170.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171.    Plaintiffs assert a second claim for relief for breach of contract on behalf of all putative members of the Incorrect Premium Billings Subclass, Premium Load Charge Subclass, and Deceptive Illustrations Subclass.

172.    The subject policies owned by putative members of the Incorrect Premium Billings Subclass, Premium Load Charge Subclass, and Deceptive Illustrations Subclass contain the same form language as the Policy held in the Trust.

173.    Lincoln Defendants are the successors-in-interest to Jefferson-Pilot Life Insurance Company and is a party to the policies owned by putative members of the 2016 COI Increase

Subclass, Incorrect Premium Billings Subclass, Premium Load Charge Subclass, and the Deceptive Illustrations Subclass.

174.     On information and belief, thee Lincoln Defendants materially breached hundreds if not thousands of universal life insurance policies by repeatedly billing the incorrect amount of premiums owed; by wrongfully deducting Premium Load Charges (f.k.a. the "Expense Charges" deduction); and/or by failing to provide coverage consistent with deceptive illustrations presented to policyholders and incorporated into the policies. These breaches are further described in Subsections (i) through (iv), below.

**i.     Lincoln breached the Policies by Repeatedly and Deliberately Billing Incorrect Premium Amounts.**

175.     By engaging in the repeated practice of billing premiums in amounts that were different from those found in the subject policies, policy applications, and incorporated illustrations, the Lincoln Defendants materially breached the terms of the policies owned by putative members of the Incorrect Premium Billings Subclass.

176.     The Lincoln Defendants' conduct and material breaches of the subject policies have proximately caused damages to putative members of the Incorrect Premium Billings Subclass in an amount to be determined at trial.

**i.     Lincoln Breached the Policies by Wrongfully Assessing a "Premium Load Charge."**

177.     By unlawfully implementing and collecting the Premium Load Charge, the Lincoln Defendants materially breached the terms of the policies held by putative class members of the Premium Load Charge Subclass.

178.     The subject policies fail to define what the Premium Load Charge is and what it used for. Page 4 of the policies lists a "Net Premium Factor" as one of the vague "factors used in the calculation of policy values." According to Wendy Chase, Lincoln uses the Net Premium

Factor to calculate the undefined Premium Load Charge. But bootstrapping an unauthorized term to a vague factor used to calculate policy values does not amount to authorization. In fact, allowing the Lincoln Defendants to use these policy factors to unilaterally manufacture new and significant policy expenses whenever and wherever they see fit renders the policies contracts of adhesion.

179.    The propriety of a Premium Load Charge is determined by a review of the terms of each policy as a whole—what they permit, what they prohibit, and what they limit.[2]  In essence, the jury must decide what the Premium Load Charge is and whether its implementation and collection comport with the authority granted by the policies. The analysis of what constitutes a Premium Load Charge begins by clarifying what it is not. Because Lincoln itemizes Premium Load Charges separately and distinctly from the COI Charges and Administrative Charges in post-2005 Activity Reports, it can be fairly deduced that the Premium Load Charge is not a Cost of Insurance or an Administrative Charge. On information and belief, in the absence of any justification to explain its use otherwise, Plaintiffs show that the Premium Load Charge is nothing more than a pretext for an impermissible deduction in breach of the policies' terms.

180.    The Lincoln Defendants' wrongful deduction of Premium Load Charges proximately caused damages to similarly situated members of the Incorrect Premium Billings Subclass, and the Premium Load Charge Subclass in an amount to be determined at the time of trial.

## VII.
## NOTICE

181.    The Lincoln Defendants' had actual and constructive notice of Plaintiffs' claims arising from or related to the underbilling of premiums, the deceptive illustrations, the unlawful Premium Load Charges, and the unlawful COI Increase since as early as October 2014.

---

[2] Each subject policy contains the same form language, so the analysis is the same as to all the policies at issue.

Furthermore, Randolph, acting on behalf of the Trustee, outlined the Trust's claims in two written letters sent on December 14, 2016 and September 3, 2017, respectively. However, since first receiving notice of the Trust's claims in late-2014, the Lincoln Defendants' continued to incorrectly bill the Trust. This practice continued beyond Randolph's December 14, 2016 letter; it continued beyond Lincoln's revision of the premium to $14,583.00, effective 2016; and it continued beyond Randolph's September 3, 2017 letter. On information and belief, Lincoln engaged in the same deliberately incorrect billing practices while administering the Policies of similarly situated putative Class Members.

182.    The Lincoln Defendants also had actual and constructive notice of Plaintiffs' claims arising under Chapter 541 of the Texas Insurance Code since as early as December 2016, by virtue of the class action filed on December 23, 2016, captioned *Barti R. Rharwani, et al. v. Lincoln National Corp. and Lincoln National Life Ins. Co.*, Cause No. 16-cv-06605-GJP, originally filed and currently pending in the U.S. District Court for the Eastern District of Pennsylvania. Both Lincoln Defendants are named defendants in that class action, in which the controversy turns on the same form life insurance policies as the Policy in this case, and in which certain plaintiff classes and subclasses asserted private claims for relief under Chapter 541 of the Texas Insurance Code.

**i.    Notice Requirements Specific to Texas Insurance Code Claims**

183.    The Texas Insurance Code requires Plaintiffs to send Lincoln and Lincoln National a 60-day, pre-suit written notice advising the Lincoln Defendants of the Trust's specific complaint, as well as the amount of actual damages and expenses, including attorney's fees reasonably incurred in asserting the claim against the other person. *See* TEX. INS. CODE § 541.154(a)(1)–(2). However, Plaintiffs also acknowledge that the Texas Insurance Code provides a statutory exception to this requirement where, as here, giving notice would be impracticable. *See* TEX. INS.

CODE 541.154(c)(1). To the extent Plaintiffs have not satisfied the Texas Insurance Code's notice requirements, Plaintiffs accept the abatement of their claims, should either of the Lincoln Defendants' elect to file a plea in abatement.

## VI.
## CLASS ACTION ALLEGATIONS

184.     Plaintiffs bring this action as a class action and as the representatives of a Class and Subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek and request the certification of a class ("the Class" or "Class Members") comprised of the following, with sub-classes as appropriate:

> All non-excluded owners of JP Legend 100, 200, 300 and 400 life insurance policies issued by Jefferson-Pilot Corporation (now Lincoln National Corp. and The Lincoln National Life Insurance Company), who purchased such policies between September 9, 2002, and present date, and who (1) since purchasing their policies been incorrectly billed premiums at amounts significantly lower than the premium amounts listed in their respective policies, policy applications, or policy illustrations; (2) within the past fifteen years, been charged "Premium Load Charges" or "Expense Charges" against their policy values; or (3) within the past four years, received illustrations or statements of account demonstrating policy benefits or advantages that were materially inconsistent with the policy benefits or advantage ultimately received.

### DELIBERATELY INCORRECT PREMIUM BILLING CLASS ACTION
### ALLEGATIONS
### ("Incorrect Premium Billings Subclass")

185.     Plaintiffs reallege and incorporate all allegations of this Complaint as if fully set forth herein.

186.     This action is brought by Plaintiffs individually and on behalf of the following subclass—referred to herein as the "Incorrect Premium Billings Subclass"—which consists of:

> All non-excluded owners or former owners of JP Legend 300, and JP LifeWriter Legend 100, 200, and 400 series life insurance policies issued by Jefferson-Pilot Corporation (now The Lincoln

National Life Insurance Company), from September 9, 2002 to present, that were incorrectly billed premiums at amounts significantly lower than the premium amounts listed in their respective policies, policy applications, or policy illustrations, resulting in any one or more of the following consequences: abridged coverage; the premature lapse, surrender, or forfeiture of policies; payment of "catch-up" sums in order to maintain coverage for the originally represented term; and/or reduction in death benefit amounts.

187.    The Incorrect Premium Billings Subclass consists of thousands of consumers of life insurance and is therefore so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by the Lincoln and Lincoln National.

188.    The claims asserted by Plaintiffs are typical of the claims asserted by the Incorrect Premium Billings Subclass.

189.    Plaintiffs will fairly and adequately protect the interests of the Incorrect Premium Billings Subclass.

190.    Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, insurance billing matters, as well as class and complex litigation.

191.    Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

192.    This action is appropriate as a class action pursuant to Rule 23(b)(3), Rule 23(b)(2), and Rule 23(b)(1) of the Federal Rules of Civil Procedure because common questions of law and fact affecting this class predominate over those questions affecting only individual members. Those common questions include:

a.    The construction and interpretation of the form life insurance policies at issue in this litigation;

b.      whether the Lincoln Defendants' repeated failures to bill premiums at the amount agreed to in the policies violated the terms of those form policies;

c.      whether Plaintiffs and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages;

d.      whether the Lincoln Defendants' were aware of the premium billing error, and if so, when the Lincoln Defendants became aware of the premium billing error;

e.      whether the Lincoln Defendants' premium billing methodology applies generally to the class, so that injunctive relief is appropriate respecting the class as a whole;

f.      whether inconsistent or varying adjudications with respect to individual class members concerning the propriety of the underbilled premiums would establish inconsistent standards of conduct; and

g.      whether adjudications concerning the underbilled or otherwise incorrectly billed premiums would, as a practical matter, be dispositive of interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

193.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.      the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that the Lincoln Defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b.       when the Lincoln Defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

c.       this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of the decisions;

d.       without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e.       this action does not present any undue difficulties that would impede its management by the Court as a class action.

f.       this action shall be filed contemporaneously with the notices required under Section 541.255 of the Texas Insurance Code for class relief—which Plaintiffs shall send to the Lincoln Defendants, as well as the Commissioner of the Texas Department of Insurance.

## IMPROPER PREMIUM LOAD CHARGE CLASS ACTION ALLEGATIONS
### ("Premium Load Charge Subclass")

194.   Plaintiffs reallege and incorporate all allegations of this Complaint as if fully set forth herein.

195.   This action is brought by Plaintiffs individually and on behalf of the following subclass—referred to herein as the "Premium Load Charge Subclass"—which consists of:

> All non-excluded owners or former owners of JP Legend 300, and JP LifeWriter Legend 100, 200, and 400 series life insurance policies issued by Jefferson-Pilot Corporation (now The Lincoln National Life Insurance Company) who, within the past fifteen years, Lincoln charged "Premium Load Charges" or "Expense Charges" (other than Administrative Charges permitted under the policies) against their policy values, resulting in any one or more of the following consequences: abridged coverage; the premature lapse, surrender, or forfeiture of policies; payment of "catch-up" sums in order to maintain coverage for the originally represented term; and/or reduction in death benefit amounts.

196.    The Premium Load Charge Subclass likely consists of thousands of consumers of life insurance and is therefore so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by the Lincoln Defendants.

197.    The claims asserted by Plaintiffs are typical of the claims asserted by the Premium Load Charge Subclass.

198.    Plaintiffs will fairly and adequately protect the interests of the Premium Load Charge Subclass.

199.    Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, insurance billing matters, as well as class and complex litigation.

200.    Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

201.    This action is appropriate as a class action pursuant to Rule 23(b)(3), Rule 23(b)(2), and Rule 23(b)(1) of the Federal Rules of Civil Procedure because common questions of law and fact affecting this class predominate over those questions affecting only individual members. Those common questions include:

a.    The construction and interpretation of the form insurance policies at issue in this litigation;

b.    whether Plaintiffs and subclass members are entitled to receive damages as a result of their payment of unlawful Premium Load Charges or Expense Charges;

c.    whether the Lincoln Defendants' Premium Load Charge billing methodology applies generally to the class, so that injunctive relief is appropriate respecting the class as a whole;

d.      whether adjudications concerning the propriety of the Premium Load Charges and Expense Charges would, as a practical matter, be dispositive of interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

202.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.      the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that the Lincoln Defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b.      when the Lincoln Defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

c.      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of the decisions;

d.      without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e.      this action does not present any undue difficulties that would impede its management by the Court as a class action.

**[RESERVED] DECEPTIVE ILLUSTRATIONS CLASS ACTION ALLEGATIONS**
**("Deceptive Illustrations Subclass")**

203.     Plaintiffs reallege and incorporate all allegations of this Complaint as if fully set forth herein.

204.     Plaintiffs reserve the right to amend this amend this Complaint at the expiration of 60 days, to seek claims under the Texas Insurance Code on behalf of the following subclass—referred to herein as the "Deceptive Illustrations Subclass"—which consists of:

> All non-excluded Texas owners and former Texas owners of JP Legend 300, and JP LifeWriter Legend 100, 200, and 400 series life insurance policies issued by Jefferson-Pilot Corporation (now Lincoln National Corp. and The Lincoln National Life Insurance Company) who, within the past four years, received illustrations or statements of account demonstrating policy benefits or advantages that were materially inconsistent with the policy benefits or advantage ultimately received, and who as a result, experienced one or more of the following consequences: abridged coverage; the premature lapse, surrender, or forfeiture of policies; payment of "catch-up" sums in order to maintain coverage for the originally represented term; and/or reduction in death benefit amounts.

205.     The Deceptive Illustrations Subclass consists of thousands of consumers of life insurance and is therefore so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by the Lincoln Defendants.

206.     The claims asserted by Plaintiffs are typical of the claims asserted by the Deceptive Illustrations Subclass.

207.     Plaintiffs will fairly and adequately protect the interests of the Deceptive Illustrations Subclass.

208.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

209.     Plaintiffs request that the Court afford class members with notice and the right to opt-out of any class certified in this action.

210.     This action is appropriate as a class action pursuant to Rule 23(b)(3), Rule 23(b)(2), and Rule 23(b)(1) of the Federal Rules of Civil Procedure because common questions of law and fact affecting this class predominate over those questions affecting only individual members. Those common questions include:

e.     The construction and interpretation of the form insurance policies at issue in this litigation;

f.     whether Plaintiffs and subclass members are entitled to receive damages as a result of their purchase of policies or amendment of policy terms made in reliance upon deceptive illustrations;

g.     whether the Lincoln Defendants' deceptive illustration practices apply generally to the class, so that injunctive relief is appropriate respecting the class as a whole;

h.     whether inconsistent or varying adjudications with respect to individual class members concerning the propriety of the deceptive illustrations would establish inconsistent standards of conduct; and

i.     whether adjudications concerning the propriety of the deceptive illustrations would, as a practical matter, be dispositive of interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

211.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.     the complexity of the issues involved in this action and the expense of litigating the claims. Few, if any, class members could afford to seek legal redress individually for the wrongs

that the Lincoln Defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b.      when the Lincoln Defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

c.      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of the decisions;

d.      without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e.      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## VII.
## INVOCATION OF *AMERICAN PIPE* TOLLING PROVISION

212.    Plaintiffs invoke the equitable tolling doctrine first articulated by the U.S. Supreme Court in *American Pipe and Construction Co. et al., Petitioners, v. State of Utah et al*. 414 U.S. 538, 94 S.Ct. 756 (U.S. 1973).

213.    Under the *American Pipe* doctrine, as applied here, the commencement of a class action lawsuit in federal court tolls all applicable statute of limitations of all claims that may be asserted by putative class members who would have been parties to the class action had the requirement of Federal Rule of Civil Procedure 23(a)(1) been met. Those putative class members' claims are tolled until class certification is denied, or until those members cease to be part of the putative class.

214. Invocation of the *American Pipe* doctrine is necessary here "[t]o insure effectuation of the purposes of litigative efficiency and economy that the Rule in its present form was designed to serve." *American Pipe*, 414 U.S. at 544.

## VIII.
## DAMAGES & ATTORNEYS' FEES

215. At this time, Plaintiffs seek $96,142.77 in individual damages and $30,000 in statutorily recoverable attorneys' fees. Plaintiffs calculated their individual damages as follows:

a. <u>First</u>, Plaintiffs seek damages for the $2,767.12 excess that the Lincoln Defendants charged as part of Plaintiffs' catch-up payment in October 2016.

b. <u>Second</u>, Plaintiffs seek damages for the excess of premiums charged by the Lincoln Defendants in 2016 and 2017. That excess amounts to $6,428 each year (or $12,856 to date), and will be $64,280 dollars more in ten years.

c. <u>Third</u>, the Lincoln Defendants' unlawful implementation and collection of Premium Load Charges (f.k.a. "Expense Charges") from 2002 to 2016 have caused Plaintiffs damages in an amount of $12,374.47. Since 2002, the Lincoln Defendants have collected $12,422.47 in Premium Load Charges (f.k.a. "Expense Charges") from Plaintiffs. However, Plaintiffs have reduced that amount by $48 to account for monthly Administrative Charges, which from 2002 to 2014 were included once a year as part of the annual Policy Expenses deduction in the month the Policy Expenses deduction was applied. The continued implementation and collection of Premium Load Charges will cause Plaintiffs future damages in an amount no less than $10,208.10 (assuming a life expectancy of 10 years for Randolph).

d. <u>Fourth</u>, the Lincoln Defendants' unlawful implementation and collection of inflated COI charges (following the 2016 COI Increase) exceed $4,050 to date, which are the sum of Plaintiffs' past COI damages. Plaintiffs' future damages from the continued implementation and

collection of unlawfully increased COI charges are expected to exceed $40,500 in the future

(assuming a life expectancy of 10 more years).[3]

     e.     <u>Fifth</u>, pursuant to the Section 541.152 of the Texas Insurance Code, Plaintiffs seek

treble damages on grounds that the Lincoln Defendants' "knowingly" conducted the unfair or

deceptive acts or practices described herein, *supra*, Part V (Second Claim for Relief).

| DAMAGE AMT. | DESCRIPTION |
|---|---|
| $2,767.12 | The excess amount that Lincoln charged for the catch-up payment in 2016<br><br>$44,000 - ([$8,155-$4,983.24] x 13 years) = $2,767.12 |
| $12,856 | The excess amount that Lincoln charged for premiums for 2016 and 2017<br><br>($14,583-$8,155) x 2 years = $12,856 |
| $12,374.47 | The total amount of "Premium Load Charges" and "Expense Charges" improperly deducted from the Policy<br><br>$12,422.47 – $48 (monthly "Administrative Charges," which from 2002 to 2014 were included once per year as part of the annual "Expense Charges" deduction) = $12,374.47 |
| $10,208.10 | The total amount of "Premium Load Charges" Plaintiffs will occur assuming a conservative life expectancy of 10 years.<br><br>($14,583 x 0.07 x 10 years) |
| $4,050 | The excess paid to cover inflated COI charges since the 2016 COI Rate Increase |
| $40,500 | The excess that Plaintiffs will have to pay if the Lincoln Defendants continue to collect the unlawfully inflated COI charges |
| $64,095.18 | The amount of additional "treble" damages Plaintiffs are entitled to recover if the Lincoln Defendants are found to have "knowingly" acted in violation of the Texas Insurance Code.<br><br>($2,767.12 + $12,856 + $12,374.47 + $4,050) x 2 = $64,095.18 |

---

[3] The future damages model projects damages caused by the future implementation and collection of Premium Load Charges and inflated COI charges are used to quantify Plaintiffs' claims for injunctive relief.

216.    Furthermore, Plaintiffs seek the recovery of all reasonable and necessary attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code and Section 541.152 of the Texas Insurance Code. To date, Plaintiffs have incurred $30,000 in reasonable and necessary attorneys' fees. Attorneys' fees may range from $100,000 to $200,000 or more if this matter proceeds to trial.

217.    **ALTERNATIVE DAMAGES**: In the alternative, Plaintiffs seek damages in excess of $75,000, which includes the amount Plaintiffs would have saved had Plaintiffs known the Lincoln Defendants would not provide the coverage represented in the October 12, 2016 Illustration. In that event, Plaintiffs' would likely not have paid the $44,000 catch-up payment or the increased premiums for the 2016 or 2017 year at the increased amount of $14,583 (a total of $29,166 for both years).

## IX.
## REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Stephanie W. Randolph, as Trustee of the Robert M. Randolph 2008 Irrevocable Life Insurance Trust dated April 1, 2008, individually and on behalf of all other similarly situated parties, respectfully requests that Defendants Lincoln National Life Insurance Company and Lincoln National Corporation be cited to appear and answer herein, and that upon final hearing or trial, Plaintiffs have from both Lincoln Defendants the following:

a.    Actual damages in an amount within the jurisdictional limits of this Court;

b.    Consequential damages in an amount within the jurisdictional limits of this Court;

c.    Additionally, treble damages in the amount of two times Plaintiffs' actual damages, payable by Lincoln Defendants, jointly and severally, to Trustee, where such actual damages arose from one or more violations of the Texas Insurance Code by Lincoln;

d.    Reasonable and necessary attorney's fees;

e.      Prejudgment interest at the maximum rate of interest permitted by law;

f.      Costs of suit;

g.      Injunctive relief enjoining the future imposition of unlawfully increased COI Rates; the deceptive practice of incorrectly billing premiums; the use of deceptive illustrations; and the unlawful implementation and collection of Premium Load Charges or other unauthorized expense charges;

h.      Post-judgment interest as provided by law; and

i.      Such other and further relief to which Randolph may be entitled, whether at law or in equity.

## X.
## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

DATED: November 28, 2017

Respectfully submitted,

**CIRCELLI, WALTER & YOUNG, PLLC**

By:  */s/ George Parker Young*

GEORGE PARKER YOUNG
State Bar No. 22184750
gpy@cwylaw.com
VINCENT CIRCELLI
State Bar No. 24058804
vinny@cwylaw.com
KELLI WALTER
State Bar No. 24074576
kelli@cwylaw.com
RICH HYDE
State Bar No. 24101949
rich@cwylaw.com
500 E. 4th Street, Suite 250
Fort Worth, Texas 76102
(682) 703-2246 telephone